BATES STREET SHIRT COMPANY

*vs.*

PARKER R. WAITE AND MAUDE R. WAITE.

Androscoggin.      Opinion September 15, 1931.

*George C. Webber,*
*Bradley, Linnell & Jones,* for plaintiff.
*W. B. & H. N. Skelton,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRINGTON, JJ.

PATTANGALL, C. J.    On report. Bill in equity brought to recover from former directors money alleged to have been fraudulently converted to their use or illegally expended by them.

The corporation was organized in 1907. The history of its first decade is not involved in these proceedings. In 1917, defendants became owners of all of its issued common stock with the exception of qualifying shares held by employees of plaintiff who with defendants made up the board of directors, but who had no financial interest in the business.

This condition continued during the entire period covered by the bill, excepting that in 1918 Herman A. Fosdick purchased of the corporation, through Parker R. Waite, four hundred shares of the common stock, paying therefor $40,000, which Mr. Fosdick held until his death in 1922 and which was held by his estate from that time until the stock was repurchased from his executrix by the corporation in 1924.

The corporation was capitalized at $500,000 with an author-

ized issue of two thousand shares of common stock of a par value of $100, and three thousand shares of six per cent cumulative preferred stock of the same par value, non-voting except as hereinafter stated.

The preferred stock was not only preferred as to earnings and assets but was issued subject to an agreement referred to in the record as the "preferred stock covenant," which read as follows:

"The holders of the preferred stock shall have no voting power except in the event of the failure of the corporation to pay the preferred dividend for six months after its regular date of payment in which case the entire voting power of the common stock holders of the corporation shall pass to the holders of the preferred stock as provided in these By-laws, and shall remain in such preferred stock until its net earnings are sufficient to pay up arrears in its dividends. As long as any of the preferred stock is outstanding, the corporation's quick assets shall always exceed its entire indebtedness, both funded and floating, together with the amount of its preferred stock outstanding, and no mortgage or encumbrance of any nature shall be placed upon the assets of the company unless by the expressed agreement of the holders of at least 75% of such outstanding preferred stock properly given at a meeting of the preferred stock holders called for the purpose."

The business was profitable during the years 1917, 1918, 1919 and 1920, the net annual profits during that period averaging $50,000. During the next two years, following the general trend of business in the country, a substantial loss was occasioned by the writing down of inventory values and a re-adjustment from wartime prices to a lower level. This loss amounted to $147,000. In 1923, the profits were $50,000. In 1924, a loss of $46,000 was sustained; in 1925, the profits were negligible; and in 1926, there appears a loss of $19,000. Combining these figures, the total net profit for the ten years was, in round numbers, $40,000.

No dividends were paid on the common stock after 1912. In lieu of dividends, the directors distributed so much of the surplus earnings among themselves in the form of salaries and allowances as seemed to them consistent with the services rendered and their obli-

gations to the creditors of the corporation and its preferred stockholders.

Dividends on the preferred stock were paid in full down to and including the semi-annual dividend of July, 1927.

The relation between quick assets and the combined amount of corporate debts and preferred stock issued was maintained in accordance with the terms of the covenant until September 24, 1924.

On February 24, 1927, Maude R. Waite resigned as a director, as also did two of the employees of the company who were then acting in that capacity, and three of the preferred stockholders, each having been given a qualifying share of common stock, were elected to the board and constituted a majority thereof. Under the new management, 1927 showed a profit of $80.00 and 1928 a loss of nearly $60,000. There was a loss in 1929, not definitely stated in the record but somewhat less than in 1928.

No dividend was paid on the preferred stock in January, 1928, and on July 6, 1928, by authority of the provisions of the preferred stock covenant, the preferred stockholders took over the entire control of the corporation which they have since retained.

The corporation has always been solvent. In considering the various issues raised by the pleadings, the rights of creditors need not be regarded. In October, 1930, the liabilities of the company, exclusive of stock issues, amounted to but $65,000 while its assets were $475,000. The preferred stock amounted at par to $290,000. The remainder was represented by the common stock, of which at that time 773 shares were outstanding and which therefore had a book value of $155 per share. This situation obtained in spite of the fact that no profits were made after 1923, but on the contrary during the six subsequent years losses of approximately $175,000 were sustained. The creditors and preferred stockholders have always been amply protected.

The specific complaints in the bill may be summarized as follows: (1) payment of salaries and other allowances without lawful authority and in excess of the value of services rendered; (2) payment of expense accounts alleged to have been excessive; (3) substituting Maude R. Waite in place of the corporation as beneficiary under policies of insurance on the life of Parker R. Waite; (4) payment of corporate funds in the purchase and retirement of

common stock from the estate of Herman A. Fosdick; (5) payment of dividends on preferred stock of the corporation when the quick assets were less than the combined amount of the liabilities and the outstanding preferred stock.

A general charge of fraudulent conduct on the part of the defendants accompanies the allegations of these specific acts.

A fair analysis of plaintiff's claims is made difficult by reason of their exaggeration. If all of its contentions were sustained, it would be entitled to judgment for approximately $400,000, a sum sufficient to pay all of the debts of the corporation and retire the entire issue of preferred stock, after paying the accumulated dividends thereon. The allowance of these claims would also involve defendants receiving no compensation whatever for ten years' services and no return on their investment. Such a result could hardly be seriously urged. Nevertheless it represents a summary of plaintiff's demands.

The bill is dated August 29, 1929. Many of the matters which are the subject of complaint occurred prior to August 29, 1923, and as to these defendants invoke the Statute of Limitations. On this point, plaintiff in its replication says that "defendants fraudulently concealed causes of action set forth in said bill in equity from said plaintiff and plaintiff further says fraud has been committed by the said Parker R. Waite and Maude R. Waite as set out in its said bill in equity which entitles said plaintiff to bring its said bill and said action was commenced within six years after plaintiff discovered that it had a just cause of action."

As a general rule, the Statute of Limitations begins to run against an action against directors of corporations for their malfeasance or nonfeasance from the time of the perpetration of the wrongs complained of. *Williams* v. *Halliard*, 38 N. J. Eq., 373; *Spering's Appeal*, 71 Penn. St. 11. This does not apply in cases of fraudulent concealment, when the statute does not commence to run until discovery or until the time prior thereto when the exercise of reasonable vigilance would have disclosed the facts; and there is another exception to the rule — the statute does not commence to run where the defendant directors are in control of the corporation and charged with the duty of instituting an action against themselves in the name of the corporation, until they cease to be

directors and have given up control of the corporation to their successors or even until a further reasonable time has been permitted for such successors to familiarize themselves with the situation. *National Bank* v. *Wade*, 84 Fed., 10; *Ventress* v. *Wallace* (Miss.), 71 So., 636; Notes, 1917A L. R. A., 980.

These defendants, having been in control of the corporation from 1917 until 1927, find no defense in the Statute of Limitations. The entire record of their administration is properly before us.

While the purpose of the bill is purely and simply the recovery of money from defendants and an action for money had and received would have been appropriate, the situation is one that permits concurrent remedy in equity.

"The jurisdiction of courts of equity to compel unfaithful directors of corporations to account to the corporation for losses sustained by it. through their breaches of trust has been settled since the time of Lord Hardwick." 3 Thompson's Commentaries on the Law of Corporations (1894 Edition), Sec. 4120; *Ellsworth Woolen Mfg. Co.* v. *Faunce*, 79 Me., 440.

Taking up the claims of plaintiff in the order stated, the salaries paid these defendants and to Mr. Fosdick may be first considered. It is alleged that salaries were illegally voted and that they were excessive in amount.

This issue may be more intelligently approached by dividing the time covered by the complaint into three periods and omitting, in the first instance, any discussion as to the amount of the salaries.

In the years prior to 1923, salaries were fixed by vote or by agreement of boards of directors consisting in whole or in majority part of the officers to whom the salaries were to be paid, all participating in fixing each individual salary, in violation of the general rule which is well settled.

"Directors cannot vote salaries to themselves. Nor can they vote a salary to one of their number as president, secretary or treasurer at a meeting where his presence is necessary to a quorum. Such votes if passed are voidable by the corporation and if money has been paid, it may be recovered back." *Camden Land Co.* v. *Lewis*, 101 Me., 78; *Pride* v. *Pride Lumber Co.*, 109 Me., 452.

The reason and justice of the rule is apparent. Directors have no authority to act for the corporation in matters in which they

are personally interested. They owe their whole duty to the corporation and they are not to be permitted to act when duty conflicts with interest. They can not serve themselves and the corporation at the same time. *European & N. A. Ry. Co.* v. *Poor*, 59 Me., 277.

But the peculiar circumstances of this case take it out of the general rule. Here the directors were the only bona fide common stockholders. It is not illegal for a corporation to distribute its profits in salaries provided that all of the stockholders assent. 2 Cook on Corporations, 6th Ed., Sec. 657.

It is settled law that "a corporation may ratify the unauthorized acts of its officers and directors, if they were within the powers of the corporation. This may be done by vote of the stockholders or may be inferred from long acquiescence. Such a ratification might validate an unauthorized or irregular issue of stock to a president in payment of salary which had been voted him at a board meeting at which his presence was necessary to make a quorum." *Camden Land Co.* v. *Lewis*, supra.

When all of the stock which is entitled to vote is owned by directors and directors act unanimously, formal ratification by the stockholders is unnecessary. Acquiescence with full knowledge of the facts is equivalent to ratification and in such a case acquiescence may be assumed.

The year 1923 stands by itself. Mr. Fosdick died in 1922. The stock which he had owned was held by his estate until it was purchased by the corporation in September, 1924. Salaries for 1923 were voted at a directors' meeting in which defendants appear to have participated in fixing the amounts which they were to receive. Their action in this respect was not ratified by the stockholders nor was it acquiesced in by the executrix of the Fosdick estate. On the contrary, she vigorously protested against it. In so doing, she was quite within her rights as a representative of minority stockholders. No dividends were being paid on the stock. Prior to Mr. Fosdick's death, it was immaterial whether the profits of the business were distributed in salaries or in dividends, but when his salary ceased, a different situation obtained. The objections of his executrix were finally silenced by the sale of the stock, but until that

was arranged she was entitled to register pertinent protest against the action of the directors.

The Fosdick estate was in a different position than that of this plaintiff. The complaint that money which should have been paid out in dividends was in fact distributed in the form of salaries was of importance to common stockholders not participating in the salaries and who might share in the dividends, but of no importance to preferred stockholders who received the dividends to which they were entitled, nor was the corporation damaged so long as the salaries paid were not excessive.

Whatever may have been the situation in 1923, equity does not call, at the present time, for the repayment to the corporation of salaries paid to these defendants, for services rendered during that year, solely on the ground that the method of fixing the salaries was irregular.

Subsequent to 1923, salaries were voted in accordance with technical requirements.

Summarizing the foregoing, we conclude that unless the salaries were excessive in amount, no damage is shown.

A court in equity has power to review the action of a board of directors, fixing the salaries of its officers, to inquire into the reasonableness of the amounts thereof, considering all of the factors involved, and if the salaries are found to be excessive to furnish adequate relief, but it is not the province of the Court to act as general manager of a private corporation or to assume the regulation of its internal affairs, and the power will only be exercised in extreme cases.

The action of directors in fixing the salaries of officers must amount to fraud upon the corporation or its stockholders before the court will interfere. *Poutch* v. *National F. & M. Co.*, 147 Ky., 242, 143 S. W., 1003. The salaries voted must be clearly excessive. *Matthews* v. *Chocolate Co.*, 130 Md., 523, 53 N. W., 218. Directors, especially when they own a majority of the stock of a corporation, are invested with large discretionary powers in the matter of fixing salaries, with which the court will rarely interfere. *Beha* v. *Martin*, 161 Ky., 838, 171 S. W., 393. If the directors act in good faith in fixing salaries, their judgment will not ordinarily be reviewed by the court however unwise or mistaken it may seem

to be. *Wight* v. *Hueblin*, 151 C. C. A., 337. The burden of proving that the salaries voted are excessive is on the complainant. *Presidio Mining Co.* v. *Overton*, 261 Fed., 1023. And if fraud is alleged, the proof must be clear and convincing, *Strout* v. *Lewis*, 104 Me., 65; *Getchell* v. *Kirkby*, 113 Me., 95.

If the salaries paid were so unreasonable in amount as to work injury to the corporation, this court has power, within the limitations stated, to correct the wrong, and if the preferred stockholders were damaged by reason of the acts of defendants, the corporation may recover for such damage in this action, although the preferred stockholders are not named as plaintiffs, for they may not, in their own behalf, seek redress for such wrongs until the corporation is shown to be unwilling or incapable of seeking the remedy for itself and for them. *Hersey* v. *Veazie*, 24 Me., 9.

"Aggrieved stockholders must seek their remedy through corporate channels. They must exhaust all remedies within their reach in the corporation itself. They must apply to the officers in charge. Failing with the officers, they must apply to the corporation itself or they must show why application would be ineffectual in either case. If they fail with both, then the courts are open for redress." *Ulmer* v. *Real Estate Co.*, 93 Me., 326.

Directors and voting stockholders alike owe a duty to non-voting stockholders.

"The common stockholders having entire control of the corporation involving their own interests and those of the preferred stockholders, the relation of trust between them and the latter with an interest, but no voice in the corporate management, more clearly appears, than in the relation of the majority to the minority stockholders who have the right to take part in the meetings of the corporation. The relation between the two classes of stockholders is plainly one of trust. Any action of the common stockholders in violation of the duty imposed on them by the trust relation would be a fraud upon the preferred stockholders." *Kidd* v. *Traction Co.*, 74 N. H., 178.

In the light of attendant circumstances, we do not find that these defendants violated their obligations either to the corporation or the preferred stockholders in the matter of salaries. The evidence, fairly analyzed, does not sustain plaintiff's claim that they were

excessive. There are many factors to be considered in determining that question. No dividends were paid on the common stock. Whatever return defendants and Mr. Fosdick secured on their investment was included in the salary account, and the investment was substantial. Defendants paid $75,000 for their stock, on which they have never received any direct return. Mr. Fosdick paid $40,000 for his stock and received nothing for the use of the money during the six years that it remained in plaintiff's treasury, unless some fair return thereon was included in his salary. They were not only directors but they filled the offices of president, vice-president, treasurer, assistant treasurer and clerk of the corporation. They also constituted the active working executive force of the company. Parker R. Waite was in general charge of manufacturing and supervised the work of the purchasing and sales departments. Mr. Fosdick gave especial attention to the financial side of the business. Mrs. Waite had charge of the accounting and credit departments and, excepting during the years from 1918 to 1922, Mr. and Mrs. Waite attended to the financing. The business was substantial, the net sales during the years 1917 to 1926 inclusive averaging nearly three-quarters of a million dollars per year. During that period, the average annual profits exceeded $29,000. The average annual amount distributed by the common stockholders among themselves was $25,000. During 1919, 1920 and 1921, the salaries were very much higher than during the remaining years. These were the years when excess profits, taxes were at their maximum and defendants pursued the course generally followed at that time, increasing salaries for the purpose of reducing taxes. Such action may have been detrimental to the government but was not injurious to plaintiff. Omitting these three extraordinary years from the calculation, the average annual salary account only amounted to $17,500 per year.

Plaintiff predicates the assumption that defendants' services were of little value on the fact that during a portion of their administration the business was unprofitable. We do not regard this argument as sound.

Defendants had charge of the business for ten years. In only four of these years is a loss recorded, and in two of them, 1921 and 1922, plaintiff suffered no larger loss proportionately than

did practically every manufacturer in America during that period of serious business depression which is still so vivid in the minds of all well-informed men of mature age that it needs but slight evidence to recall it to the memory of this court. Omitting those two years, the corporation under defendants' management made a net profit of more than $187,000 after deducting payment of preferred stock dividends and every disbursement of which plaintiff complains. The net profit for the entire ten years was slightly in excess of $40,000.

In 1927, the management passed into the hands of those now in control. The losses occurring under the new management have already been noted. It would be manifestly unjust to conclude that these losses are due to incompetent management and it is just as unreasonable to charge the losses of 1921, 1922, 1924 and 1926 to the incompetence of the former board.

At the time the salaries were paid, they were not regarded as excessive. That question was brought sharply to the attention of all of the parties interested in 1923 and 1924 by the Fosdick litigation. Auditors of high standing and expert in corporation finance, employed at the suggestion of preferred stockholders, examined that phase of the business with care and gave an opinion that the salary charges were reasonable. No common stockholder complained of them with the exception of the executrix of the Fosdick estate, and her complaints were withdrawn when the corporation purchased the stock. Indeed, as a practical matter, no one else had ground for complaint. Defendants had an undoubted right to distribute in dividends the profits of the business in excess of the requirements of the preferred stock covenant. Whether they so distributed them or divided them as salaries worked injury neither to the corporation, its creditors, nor to its preferred stockholders. If no just complaint could have been made of their acts in this respect at the time they were committed, it would seem that none can properly be entertained now, merely because during recent years, first under the old management, then under the new, the business has become unprofitable.

There is no justification for any charge of fraud or bad faith in connection with the salaries paid to defendants or authorized by them to be paid to Mr. Fosdick. Even in 1919 and 1920, the years

when the salaries reached their highest point, the condition of the business warranted them, aside entirely from the matter of taxes already referred to. In 1919, the net sales amounted to $1,230,435, the highest point reached in the history of the company. The profits were $117,000. After deducting salaries, $56,000 was added to the earned surplus account. In 1920, the sales amounted to $1,129,674, the profits were $73,000, and a further addition was made to the earned surplus account so that at the close of the year it showed a balance of $193,379, an increase of $67,000 over the figures of January 1, 1918, and on January 1, 1921, the quick assets of the company exceeded the sum of its debts and the preferred stock issue by $168,412.

As the sales fell off and profits decreased, salaries were steadily reduced until in 1926 they reached a minimum of $14,000. There was no concealment in regard to the amounts paid. They were regularly and properly entered upon the books, appeared annually in the auditor's reports, and were known, or upon even casual examination of the company's affairs might have been known, to any and all of the preferred stockholders.

In the absence of fraud or bad faith on the part of the directors, and we find none, we can not, on the facts presented here, revise their judgment as to the salaries paid during the period when they administered the affairs of the corporation.

The second subject of complaint concerns payments to Parker R. Waite on account of travelling expenses and certain other disbursements not supported by vouchers.

Under the latter head it is claimed that plaintiff is entitled to receive $5,595. The items making up this amount all refer to the year 1919. There is included therein $2,400 which appears to have been paid to Maude R. Waite as a bonus covering the years 1918 and 1919. These payments have already been considered in the discussion of salaries, in which all bonuses and allowances are included.

At the hearing on the bill in 1930, defendants were unable to find supporting vouchers for the items making up the remainder of this account. Maude R. Waite, testifying from memory, believed that it consisted in part of bonuses to various employees, considerable money having been paid out in that way during that

year. The charges were entered on plaintiff's books and must have been called to the attention of the auditors whose certification indicates that, at the time, proper vouchers were produced. It is not remarkable that defendants were unable to furnish them twelve years afterward. Mr. Fosdick was entitled to a bonus of $2,000 in 1919 and undoubtedly received it, yet, unless that amount is included in these unvouched items, there is no record of its payment. Plaintiff concedes the reasonableness of this explanation.

So far as the personal travelling expenses of Parker R. Waite are concerned, there seems to be no serious complaint, excepting that on the occasion of his marriage in 1920, he combined a business trip and a wedding journey, charging his wife's car fares and hotel bills in his expense account and that on two other occasions when she accompanied him the same thing occurred. The fact that Mr. Waite's bills when travelling for plaintiff, were, as a rule, larger than those of its regular travelling men and that vouchers had not been preserved covering all of the expenditures is also criticized. We do not deem it necessary to discuss these items in detail or at length. The facts were known at the time. The stockholders acquiesced in the expenditures. Auditors certified the accounts as properly vouched.

If the corporation was willing in 1920 that its president should at its expense enjoy the companionship of his wife while travelling on its business, it is too late now to charge the bill to him. Argument concerning this particular item may well be answered by quoting the maxim approved by our court in *Woodbury* v. *Marine Society*, 90 Me., 23, "Equity does not stoop to pick up pins."

The claims based on the substitution of Maude R. Waite for the corporation as beneficiary under two policies of insurance on the life of Parker R. Waite may be next considered.

At the time Mr. Fosdick became connected with the business, the corporation was named beneficiary in two policies for $25,000 each on the life of Parker R. Waite and was paying the premiums thereon. It was decided that a policy for $25,000 should be taken out on the life of Mr. Fosdick for the benefit of the company and at its expense, and that the amount of Mr. Waite's insurance, so far as the company was concerned should be reduced to $25,000. Instead of cancelling the policy which the company did not care

to longer carry, Maude R. Waite was made beneficiary and the policy continued in force.

Plaintiff urges that defendants should either pay back to the company the premiums which it had paid on this policy or at least pay to it the cash surrender value of the policy. There is no good reason for doing either. The premiums paid by the company secured it the protection which it desired during the time it was beneficiary. Unless it had the proprietary interest in the policy, it had no right to the cash surrender value; otherwise that belonged to Parker R. Waite.

The record does not clearly show that plaintiff's interest was other than that of a mere beneficiary. If it had further rights on which a claim for damages might properly be based, it was incumbent on it to prove the fact. While Mrs. Waite was benefited by the change of beneficiary, the evidence does not show that plaintiff was damaged thereby.

Later another policy for $75,000 was issued on Mr. Waite's life and the company named as beneficiary. In 1924 a change was made and Mrs. Waite made beneficiary. In 1926 another change was made and the company not only became again the beneficiary, but the proprietary interest in the policy was transferred to it. The company lost nothing by the transaction and should not recover anything because of it.

It is true that while Mrs. Waite was beneficiary, plaintiff paid the premiums on the policy. If Mr. Waite had died during that time, plaintiff could have recovered from Mrs. Waite the amount so paid. As the matter stands, however, Mrs. Waite was not benefited, nor was plaintiff injured by reason of the temporary change. Plaintiff now having the proprietary interest finds reimbursement for the premiums paid by it in the increased cash surrender value of the policy.

Plaintiff claims that the action of the directors in September, 1924, in purchasing the Fosdick stock was unwarranted because it resulted in reducing the quick assets below the limit fixed by the preferred stock covenant, and that these defendants are liable for the amount expended for that purpose, together with interest thereon from the date of payment.

The consideration of this claim necessitates a brief review of the

history of Mr. Fosdick's connection with plaintiff and the circumstances which led up to the purchase of this stock from his executrix. In June, 1918, Mr. Fosdick arranged to purchase four hundred shares of the common stock of the plaintiff corporation at par. Part of the stock was issued immediately and the balance during the following six months, the company receiving $40,000 as a result of the sale. Mr. Fosdick was elected a director, vice-president and assistant treasurer on July 1, 1918, and a by-law was passed defining his duties.

An agreement previously made between him and Mr. Waite was ratified, in so far as it concerned the corporation. Under this agreement, Mr. Fosdick was to receive the same remuneration as that paid Mr. Waite. There was also to be transferred to him by Mr. Waite, without payment of any money consideration, one hundred shares of common stock which was to be re-assigned if at any time Mr. Fosdick ceased to maintain his official connection with the company.

Mr. Fosdick gave his entire time to the service of the company until his health began to fail in 1921. After that he continued to act in an advisory capacity until he died in June, 1922. During this time he drew as compensation for his services $46,702.91. No dividends were paid on the common stock during his ownership. It may be noted that in 1918 a policy of insurance for $25,000 was issued to him in which plaintiff was named as beneficiary and that plaintiff received in December, 1922, the sum of $25,115.23, the proceeds of this policy, on which it had paid premiums for four years.

After Mr. Fosdick's death, the corporation continued its policy of paying no dividends on the common stock and the investment became unprofitable to his heirs. In 1923, his executrix brought a bill in equity, the purpose of which was to force a sale of the stock or compel a division of profits on a basis which would make it income producing. This bill was dismissed on technical grounds and in 1924 a second bill was brought with the same objects in view.

While the ultimate purpose of both bills was as stated, each contained charges of fraud and mismanagement against the Waites. Although the first bill was dismissed and the second never came to a hearing, the allegation contained in both were widely published

as a result of which both these defendants and the corporation were subjected to unpleasant criticism, applications for loans were more closely scrutinized than had been ordinarily the case; and those connected with the company believed with good reason that the pendency of the litigation was injurious to its business.

After the bringing of the second bill, Parker R. Waite brought an action against the Fosdick estate to compel the return to him of the one hundred shares which he had transferred to Mr. Fosdick and the corporation sued to recover $5,300 which it claimed was due it from Mr. Fosdick. Mr. Waite's claim was unquestionably sound. The claim of the corporation was somewhat doubtful.

A suggestion was finally made that the purchase of the Fosdick stock by the corporation might lead to an abandonment of all of the controversies and negotiations looking toward that end were begun. Aside entirely from the pending litigation, there were reasons for buying the stock which appealed to those familiar with the affairs of the company. It had benefited for six years by the use of $40,000 of Mr. Fosdick's money without paying interest thereon; it had received from his life insurance approximately $24,000 in excess of the premiums paid on the policy. He had rendered it faithful and valuable service for more than three years and when everything was taken into account, the net cost of that service to the company amounted to less than a reasonable salary for a single year. His family was left with an investment which was necessarily unproductive unless the method of distributing profits which the corporation had followed for many years was abandoned and even then, it was not such an investment as would recommend itself to any but an active business man valuing it as a means of securing profitable employment.

These considerations did not affect the situation from a legal standpoint; they did affect it from the standpoint of fair dealing. And while they would not, standing alone, have justified the purchase of the stock in the then financial condition of the company, there was added to them the factor of making peace with a stockholder who apparently intended to continue to harass the corporation with litigation so long as any excuse could be found upon which to base a suit. In this situation, the wisdom of purchasing the stock seemed apparent and was finally consummated on the fol-

lowing terms: The Fosdick estate was to be paid $35,000, the claim of the corporation against Mr. Fosdick was to be cancelled, the stock belonging to Mr. Waite returned to him, and the four hundred shares for which Mr. Fosdick paid the corporation $40,000 assigned to the plaintiff. This arrangement was immediately carried out.

The right of a corporation to purchase its own stock and to retire or reissue the same is not questioned. The amount paid can not be criticised. The book value of the stock at the time of purchase was in excess of $150 per share. If the directors acted in good faith, exercising their best judgment and honestly believing that what they did was for the benefit of the corporation, this Court has no authority to review their act, unless some peculiar feature takes the case out of the general rule applicable to such a situation.

At this time, the directors of the corporation were Parker R. Waite, Maude R. Waite, Harry Manser, A. M. Richardson and E. O. Garns. Miss Richardson was a sister of Mrs. Waite, employed by the company as a bookkeeper. Mr. Garns was and is now an employee of plaintiff. Mr. Manser was counsel for the company.

Plaintiff makes no claim that the directors, other than the defendants, were guilty of bad faith in this transaction. It alleges that only the defendants knew of the financial situation of the company in September, 1924, and "fraudulently and wilfully withheld the information from the directors and from others with whom they consulted"; that they "fraudulently and wilfully brought about the vote" to purchase the stock and "used their peculiar position of trust and responsibility for personal benefit"; that they "fraudulently and wilfully withheld information as to the financial condition of the company in a letter sent to preferred stockholders"; and that the letter contained at least one statement that "was false and known to them to be false."

It is upon these grounds that plaintiff predicates liability on the part of defendants to the exclusion of the remaining directors. It relies upon the proposition that Mr. Manser, Mr. Garns and Miss Richardson were pliant tools in the hands of defendants who, by fraudulent concealment and misrepresentation, induced the board

of directors to adopt a course of conduct which resulted in defrauding the company and caused it to sustain a large monetary loss for which defendants are liable. On any other theory, it must have joined the remaining directors as defendants.

The evidence does not support these allegations. Whatever may have been the situation with regard to Mr. Garns and Miss Richardson, there is no question but that Mr. Manser was fully informed as to the financial condition of the company at the time the Fosdick stock was purchased. He had been elected director in 1922 to fill the vacancy caused by the death of Mr. Fosdick. He was also counsel for the corporation, and although a nominal stockholder was active in its affairs and conversant with them.

There is no evidence whatever that the Waites or either of them exercised any influence to procure his assent to the vote authorizing the purchase of the Fosdick stock. On the contrary, he was the director who made the motion that such action be taken. And there is no evidence that defendants even suggested to Mr. Garns or Miss Richardson how they should vote on the motion. As a matter of fact, Mr. Manser initiated the negotiations which led to the purchase of the stock and strongly advised it. Not willing to take entire responsibility in the matter, he called into consultation a second attorney of recognized ability and integrity and, realizing that the situation presented a business as well as a legal problem, he conferred at length and in detail with the head of the firm of brokers which had marketed an issue of $118,000 of the preferred stock, who was himself a holder of preferred stock, who had sold a substantial amount of the stock to his wife as well as to personal friends and business associates, and who with full knowledge of the facts from every angle of approach advised the purchase.

Defendants acted in accordance with the advice which they received. There is no claim but that Mr. Manser acted in good faith and for what he believed to be the best interests of the company. We can not find defendants guilty of fraud in accepting his view as to the proper course to pursue.

Nor can we hold them liable because they received some personal benefit from the arrangement. They were relieved from the burden of defending the action then pending and their position as stock-

holders was somewhat improved by the cancellation of the Fosdick stock, but the right of the corporation to purchase the stock was not affected by the fact that the common stockholders were incidentally benefited by its so doing.

The purchase of the stock and the consequent reduction of the quick assets of the corporation was the act of the board of directors, not of the defendants, nor was it induced by fraud of the defendants as alleged by plaintiff. We are satisfied that the directors, including the defendants, acted in good faith, believing that the best interests of the corporation demanded the elimination of the Fosdick estate as a stockholder.

While a corporation may, in an action brought in its name, redress an injury done to its stockholders by its officials, proof of the violation of a contractual obligation, by joint action of a board of five directors acting in good faith, does not satisfy a charge of individual fraud on the part of two of them.

Four semi-annual dividends on the preferred stock were paid by order of the directors in 1925 and 1926 after the quick assets had been reduced below the point required by the by-laws, and plaintiff claims that defendants should restore to the treasury of the corporation the money so paid, together with interest thereon, the total amount being $45,484, alleging that the defendants committed a breach of trust in paying these dividends.

Adequate answer to this claim is that during this period there was at all times, after proper adjustments were made, a balance of earned surplus sufficient to warrant the payments. The propriety of paying them was recognized by the new management and by the preferred stockholders themselves who, by formal vote, continued to pay them through the following year.

The general charges of fraud, neglect and mismanagement may be disposed of without extended discussion. Of similar charges contained in the first bill in equity filed by the executrix of the Fosdick estate, Mr. Justice Morrill said, "These charges are not sustained. They have no foundation." The statement applies as well to the instant case. Plaintiff has not sustained the burden of proving these charges. On the contrary, there is much to prove that defendants conducted the business of the corporation with fidelity and integrity.            *Bill dismissed with costs.*