## UNION ELECTRIC CO. OF MISSOURI v. BOEHM et al.

## UNION ELECTRIC POWER CO. v. BOEHM et al.

### Nos. 542, 543.

United States District C
E. D. Missouri, E. D.

June 5, 1950.

sippi River Power Company. In May of 1945 this corporation was merged into Union Electric Company of Missouri, and this cause of action, with other property rights, assigned to the latter corporation. Accordingly Union Electric Company of Missouri was substituted in case number 542. Operations during the period covered by this suit were by the Mississippi River Power Company. Case 543 was filed by Union Electric Company of Illinois. On June 1, 1945, the name of this corporation was changed to Union Electric Power Company. An order substituting name was made in case 543. From 1930 to 1937 operations covered by case 543 were by Union Electric Light and Power Company of Illinois. This company was merged into the Union Electric Company of Illinois in 1937.

Each plaintiff seeks an accounting on identical facts, based on a charge of misappropriation of corporate funds by defendants from the named predecessors of plaintiffs. Conspiracy is charged in each case. Defendants deny all charges and plead ratification, acquiescence, estoppel, laches, statute of limitations, lack of clean hands, and res adjudicata.

Because an accounting will involve examination and auditing of numerous records, books and papers, covering receipt of funds by defendants in excess of $300,000, over a period from January 1930 to November 1938, the issue of right to an accounting was tried first. Decision on that issue is now for ruling.

Jurisdiction is based on diversity. Plaintiffs at time cases were initiated were non-resident corporations. Defendants are residents of Missouri. The amount involved as to each plaintiff and defendant exceeds $3,000, exclusive of interest and costs.

During the period involved the corporations named had their principal office in the same building with Union Electric Company of Missouri.[1] Funds presently to be referred to were paid out by Union Electric, then its accounting department would bill a portion to the original plaintiffs, who paid the charges. The principal officers of the

Lashly, Lashly & Miller, Jacob M. Lashly, Israel Treiman, John H. Lashly and Paul Lashly, all of St. Louis, Mo., for plaintiffs.

Charles J. Margiotti, Sebastian C. Pugliese and Samuel Goldstein, all of Pittsburgh, Pa., D. W. Gilmore of Benton, Mo., Paul Dillon and Claude O. Pearcy, of St. Louis, Mo., for defendant Frank J. Boehm.

Green, Hennings, Henry & Evans, Thomas C. Hennings, Jr., J. Porter Henry and Robert D. Evans, all of St. Louis, Mo., for defendant Albert C. Laun.

Harold S. Horwitz of St. Louis, Mo., for defendant Oscar F. Funk.

HULEN, District Judge.

The present plaintiffs in cases 542 and 543, consolidated for trial, are substituted parties. Case 542 was initiated by Missis-

---

1. Herein referred to as "Union Electric".

corporations were the same. Defendant Boehm was a vice-president of all three companies. Funk was comptroller, until 1935 when he became a vice-president. Laun was in charge of the real estate and tax divisions, until 1935 when he became a vice-president. The defendants were active during the period in the management of the affairs of the companies and had a measure of control, trust and confidence with respect to company funds and their disposition. Their relationship was a fiduciary one toward each corporation.

During the years 1930 to 1938 defendants[2] initiated various nefarious schemes for securing possession of corporate funds, in currency, of the companies named. Among the plans used by defendants were —(1) to have lawyers (two practicing in Illinois and one in Iowa) bill the Union Electric for fictitious sums of money in addition to proper fee charges, usually twice the legitimate amount, and then the lawyers would return the spurious charge to one of defendants personally in cash; (2) an insurance company was prevailed on to present and collect from Union Electric a fake bill for services never performed by the insurance company, and then return the payment ($15,000) in cash; (3) the same insurance company remitted excess premiums due Union Electric by paying the excess in cash to one of the defendants; (4) defendants caused employees under their supervision and control to file fraudulent expense accounts against Union Electric and to pay the false sums so collected to defendants personally in cash; (5) suppliers of equipment were called upon to kick back in cash substantial sums paid by Union Electric to them. The total amount received by defendants from these sources is in dispute, but concededly it exceeds $300,000 during the period from 1930 to 1938. Some of the currency was kept by defendant Boehm in an envelope in a safe in his private office.

No corporate records reflected the money so obtained by defendants or any expenditure of it. The envelope in which Boehm kept currency carried some characters on it indicating to him from whom the cash was received.

These operations by defendants ceased only when investigators for the Federal Government uncovered their character. See Union Electric Co. of Missouri, et al. v. United States, 8 Cir., 137 F.2d 369.

Defendants' conduct in falsifying the corporate records to hide receipt of corporate funds by them constitutes one of the darker portions of a record replete with sordid details of debasement of persons in private pursuits and those holding public office. The lawyers referred to were urged to make false income tax returns to protect defendants in falsifying the records of the companies. The defendants coerced employees of Union Electric, beholden to them for their positions, into acts of dishonesty and deceit regarding company funds and records. This phase of the record is revolting in its entirety. Records, falsified by employees at the behest of defendants, were submitted to public officials charged with establishing consumer rates, based on expenses of operations among other things. Such records were submitted to the United States as representing true operating expenses to arrive at income taxes due. They were submitted to the State of Missouri for like purposes. When the Government investigation got under way employees were entreated to commit perjury in regard to the records, and congratulations were tendered to those who complied.

Receipt of the money as now charged and proven by plaintiffs after several days of trial was blandly admitted—a fact which defendants refused to stipulate at pre-trial conference. Defendants' main defense would seem to be, what they did was ordered by their superiors, and therefore no blame, moral or legal, attaches to them. Testimony of doubtful competency was offered by defendants that "all" the money so received was spent for "company purposes". These "company purposes" include what defendants term contributions to campaign expenses of persons running for public office. Whether the contribution

2. Defendant Funk severed his connection with plaintiffs on June 3, 1938.

was made before or after termination of the campaign is a matter of speculation. At least during a part of the period covered, this was an unlawful act for a public utility corporation. One defendant gave testimony from which we conclude that between 1930 and 1938 not less than five hundred, and possibly one thousand, members of the Missouri Legislature came into the orbit of defendants' corrupting influence. Some voluntarily sought their own debasement; the more wary waited for defendants to seek them out. Entertainment of public officials by defendants, though lavish, was secondary in its impact. A sidelight we note in passing is that when the time came that defendant Boehm considered silence would no longer serve him, he elected to name as receivers of the fund only a selected group for public dishonor. One of the defendants testified paying a Judge Severe several thousand dollars on three different occasions. The last payment was made, so it was testified, while the Government investigation was in progress. This defendant postponed his resignation in order that he might complete delivery of the money "while still a corporate officer". What possible benefit could have resulted to the company from this payment, at this time, is hard to conceive. The judge named presided over the court to which some appeals go from the Public Service Commission. This Commission, among other controls, passes upon rates which public utilities charge consumers in Missouri. An assessor of Miller county, where one of the plaintiffs has a dam and hydro-electric plant, it was testified, was solicited too and did receive of the "slush fund". This official valued plaintiff's property, consisting of the dam and hydro-electric plant, for tax purposes. He was described by one of the defendants as easy to deceive after receipt of a cash contribution—with the result the dam and plant were valued "several million dollars" below the amount they are lawfully subject to. If true the conclusion is obvious —cash payments to this official accelerated the deceiving process to the public loss of taxes justly due and owing by plaintiffs for the county and school districts of Miller county. This distribution of corporate funds among public officials charged with duties affecting corporate operations defendants would dignify as contributing to campaign expenses. It was bribery in its most simple form.

We cannot now calculate the extent to which the public interest suffered by defendants' corruption of public officials, or the extent to which plaintiffs gained. During a part of the years involved defendant Boehm asserts that he "saved" several million dollars to the company as a result of legislation defeated. What the accrument was that could be credited to evasion of taxes in Miller county the record does not show. If such conclusions be established, then whether these are corporate benefits that a court of equity will recognize remains a question of law to be decided when it becomes an issue under our ruling.

▮ We have only briefly sketched some of the uses to which defendants would have the Court believe the money received by them was put. This is not an accounting. Its place in the record rests on testimony of little or no value in an accounting. The mere statement of defendants—and that is all there is in this record—that the money was spent for corporate purposes, or the corporation derived benefits therefrom, is not the proper manner to account. The relation of defendants to the corporations was that of a fiduciary or quasi-fiduciary. See Wootton Land & Fuel Co. v. Ownbey, 8 Cir., 1920, 265 F. 91, loc. cit. 99:

"When the defendant is an accounting party, and stands as one occupying a fiduciary relation toward the plaintiff, because of money or property intrusted to him, the burden is upon him to show that he has performed his trust and the manner of its performance. He owes this duty because of the confidential relation he bears to his principal, and because he is presumed to know how he has performed his duty. (Citing authorities.) He must therefore prove any allowances or credits that he may claim to have made on behalf of his principal. In making proof of credits claimed by him, he should present an itemized statement, showing the details of expenditures, with the vouchers, receipts, and

memoranda supporting his claim. (Citing authorities.)

\* \* \* \* \* \*

"It follows as a corollary to these principles that the duty to account is not fulfilled by a mere general statement that the money was expended for the principal's benefit or business, or by a general denial that any of the principal's money was taken for the personal use of the trustee. Such statements are but the conclusions of the witness, and afford no reasonable opportunity to the principal to test the fact or the propriety of the expenditures, and give the court no basis for determining from the facts of each transaction whether the trustee has faithfully performed his duty. (Citing authorities.)"

██ Defendants plead ratification and estoppel because the parts played by them in securing and dispensing company funds were directed by the managing officers of North American Company, parent company of plaintiffs. There is little or no competent evidence now in the record to sustain this defense, but assume it establishes defendants were executing orders of officers of the parent company. Decision on this issue as it affects defendants turns on determination whether defendants' conduct was malum in se or an act in which only the stockholders are interested. If the latter, it can be ratified and plaintiffs can be estopped; if the former, restitution can be compelled even if plaintiffs acquiesced in the acts complained of.[3] A corporation has no power to "ratify" acts which are "illegal and immoral in the eyes of the law". See Medlin Milling Co. v. Moffatt Commission Co., D.C.W.D.Mo.1915, 218 F. 686, 691. Also in point is Bensiek v. Thomas, 8 Cir., 1895, 66 F. 104, loc. cit. 110: "When an act done by a private corporation is not per se illegal, or malum prohibitum, but is simply ultra vires, and is not a matter of public concern, but merely affects the interests of the stockholders, the latter may so act as to deprive themselves of the right to challenge its validity."

. (A) In the accounting it will be determined in which category expenditures, if any, fall, and amount; and as to any coming under classification of which only the stockholders are interested, defendants may offer evidence of ratification and present the issue.

As to the defense of benefits derived by the plaintiffs from defendants' acts working an estoppel, that question we do not now rule. It may be moot.

(B) In the accounting if it is shown by competent evidence plaintiffs were benefited by any expenditures from the monies in issue, the amount, and how plaintiffs benefited by the expenditures of the whole, or some parts, of the money received by defendants, may be shown. Then as to such sums showing a resulting benefit, defendants may again raise the question and present the issue.

█ Defendants raise the issue of statute of limitations. This suit was filed May 11, 1941. It is claimed the five year statute, Sec. 1014, R.S.Mo.1939, Mo.R.S.A., applies.

The present record is that outside of individuals involved, including certain officers with the North American Company, it was effectively hidden until the Government inquiry. There is no proof that a board of directors of any of the companies interested had any knowledge prior to that time, to say nothing of stockholders. All interested corporations during the period, or a part of it, had stockholders among the public generally. Under the facts of this case we do not believe the statute started to run until the fraudulent conduct of defendants became known to others than those a party to it. See Bailey v. Jacobs, 325 Pa. 187, 189 A. 320; Endicott v. Marvel, 81 N.J. Eq. 378, 87 A. 230; Bates Street Shirt Co. v. Waite, 130 Me. 352, 156 A. 293.

Whether the corporation derived a benefit from defendants' acts may have some bearing on this issue. Also the accounting should complete the record so that any rul-

3. Luyckx v. R. L. Aylward Coal Co., 1935, 270 Mich. 468, 259 N.W. 135; Roth v. Robertson, 1909, 64 Misc. 343, 118 N. Y.S. 351; Kissane v. Brewer, 1921, 208 Mo.App. 244, 232 S.W. 1106.

ing thereafter may be a final one and not require further accounting.

(C) In the accounting a finding will be made, in two parts, as to matter submitted for accounting; one part, as to dates, on defendants' theory as to running of the statute, and one part, as to dates, on plaintiffs' theory the statute was tolled by the active acts of defendants of concealment of the money received.

We come to the claim of defendants based on the maxim—"He who comes into equity must come with clean hands". We have already observed that during the period covered there was a public holding of stock in all the companies involved. If the veil be pierced and North American Company be considered as the plaintiff because of its present ownership, that situation is not changed. We think the ruling in Francis Oil and Refining Co. v. David A. Manville & Co., Inc., 2 Cir., 296 F. 349, 352, applies and is controlling on the present record:

"Valuable as are the great maxims of equity, they must not be applied so as to forsake substance for form.

"In the Primeau Case, [Primeau v. Granfield, 2 Cir., 193 F. 911] the court left two wrongdoers where they were, although Stewart v. Wright, [8 Cir.] 147 F. 321, 77 C.C.A. 499, is an illustration of the efforts of courts to find just solution in each case upon its own facts. Here, however, the wrong has been done only in form to the corporate plaintiff. The real sufferers are the innocent stockholders, and equity will break down artificial barriers so as to award relief to them.

"Indeed, where the wrong goes beyond the parties themselves, and particularly where the plaintiff seeking recovery is in some relation to others whereby his participation in the wrong injures them, the courts reach below the surface in the desire to protect the injured. Wetmore v. Porter, 92 N.Y. 76; 21 C.J. 189; Saylor v. Crooker, 97 Kan. 624, 156 P. 737, Ann.Cas.1918D, 473.

"There may, of course, be cases where a plaintiff corporation is in no different position from an individual plaintiff, but such is not this case.

"Finally, it may be observed that a decree will not be denied because, as disclosed in this record, two officers of this plaintiff participated in the transactions and, if stockholders, may incidentally benefit by the decree."

Holding of the Court of Appeals in Union Electric Co. of Missouri, et al. v. United States, 8 Cir., 137 F.2d 369, is urged as res adjudicata. It was ruled in that case the corporate defendant could be held for violation of the Public Utility Holding Company Act, 15 U.S.C.A. § 79 et seq., because of campaign contributions made by its officers. Defendants urge that since some of the money received by them and involved in this accounting action was the same money for the expenditure of which the corporation was held responsible, they cannot now be held to account to the corporation convicted for the same expenditures. The issue is not so simple.

First, it is not in the record how much of the money received by defendants was so expended. As to sums so expended the issue here is of a different character from the criminal proceeding. There the question was solely one of corporate liability to the public. Naturally the corporation had to act through agents. Here the corporation seeks an accounting, from its officers and agents, for its funds received by the defendants. That a corporation has been held liable criminally (or to a third party) for acts of its agents does not settle accounts as between the principal and agent. Neither does the decision referred to work estoppel or convict the plaintiffs of unclean hands in this suit against its officers.

Let interlocutory decree for accounting be submitted; to cover also matters set forth in paragraphs designated (A), (B) and (C); with findings of fact and conclusions of law.