635 A.2d 394

Robert E. HECHT et al.

v.

RESOLUTION TRUST CORPORATION.

Misc. No. 4, Sept. Term, 1993.

Court of Appeals of Maryland.

Jan. 11, 1994.

Richard E. Dunne, III (George Beall and Kathryn W. Lovill, Hogan & Hartson, all on brief), Baltimore, for appellant.

Christopher A. Myers (Gina Schaar Howard and Colleen Covell, Dunnells & Duvall, all on brief), Washington, DC, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE,* CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

---

* McAULIFFE, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled

MURPHY, Chief Judge.

The questions presented in this case have been certified to us by the United States District Court for the District of Maryland, pursuant to the Uniform Certification of Questions of Law Act, Maryland Code (1989 Repl.Vol.) §§ 12–601 through 12–609 of the Courts and Judicial Proceedings Article, and Maryland Rule 8–305. They focus on the doctrine of adverse domination, which, in its several versions, may toll the running of limitations or accrual of a cause of action by a corporation against its officers and directors as long as they remain in control of the corporation.

## I

Resolution Trust Corporation (RTC)[1] instituted suit in the United States District Court for the District of Maryland on February 6, 1992, against the defendants, ten former directors and officers[2] of Baltimore Federal Financial, F.S.A. (Balti-

---

pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. The Resolution Trust Corporation (RTC) is a federal corporation created pursuant to Title V of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989), 12 U.S.C. § 1441a(b)(1). The RTC operates under the direction of the Federal Deposit Insurance Corporation (FDIC) and is charged with managing failed savings and loan institutions. The RTC brings this claim in its corporate capacity.

2. The nine directors and their tenure on the Baltimore Federal board are here listed:

| | |
|---|---|
| Robert E. Hecht, Sr., Chairman | Dec. 1974 to Feb. 17, 1988 |
| Pearl C. Brackett | July 1977 to April 1987 |
| Leonard W. Dayton | Jan. 1980 to 1988 |
| James L. Fisher | 1975 to June 1988 |
| John F. Ireton | Oct. 1983 to 1988 |
| Thomas F. Mullan | 1958 through Dec. 19, 1984 |
| Melvin T. Pugatch | July 1983 through June 1988 |
| Gerald J. Stautberg | 1973 through Sept. 18, 1985 |
| Ward R. Woods | October 1983 to 1988 |

more Federal), a federally chartered mutual savings and loan association, for losses allegedly incurred as a result of reckless lending practices during the period 1983 to 1985. The complaint alleges counts of simple negligence,[3] gross negligence, breach of contract and breach of fiduciary duty for loans made by Baltimore Federal during that period. RTC alleges that the defendant directors and officers committed substantial sums of money to highly speculative and negligently underwritten commercial real estate and construction ventures that were excessively risky and ultimately resulted in claimed financial losses for Baltimore Federal in excess of $32,000,000.

RTC filed its claim in federal district court as assignee of the rights of Baltimore Federal; it asserts that the claim was assigned to it at the time it was appointed conservator of Baltimore Federal. This appointment was the culmination of a series of events marking the beginning of the end for the troubled institution.

The first event occurred in 1985, when the Federal Home Loan Bank Board (FHLBB), as part of its regulatory activities, conducted an examination of Baltimore Federal which resulted in a report severely critical of the institution's commercial real estate loan solicitation program, and, in particular, its large number of special purpose loans made out of the institution's normal lending area.[4] The report noted signifi-

---

These defendants constituted a majority of the Baltimore Federal board at all times from 1983 to 1988. Mr. Hecht was also an officer, serving as CEO during the same time period he served as chairman; he also served as president from 1975 to July 17, 1985.

Also named as defendant was corporate officer Thomas J. Reynolds, executive vice president and head of the lending division from 1982 through June 1985.

3. Counts alleging simple negligence were dismissed by the court.

4. During most of its history, Baltimore Federal was engaged primarily in making loans for residential mortgages and small residential developments in Baltimore, Md., and surrounding communities. In 1982 the vast majority of its loan portfolio was in relatively long-term, fixed-rate residential mortgages. That year, however, Baltimore Federal began to liquidate much of its existing portfolio and use the proceeds to make higher-interest, higher-risk commercial real estate and acquisition, development and construction loans outside of Maryland. Beginning in 1983, the bank began to expand dramatically its lending into

cant problems in record keeping and loan documentation controls.

The institution's difficulties continued when, on July 2, 1986, the FHLBB required Baltimore Federal to enter into a Supervisory Agreement which required, among other things, that Baltimore Federal remedy severe accounting and underwriting problems.

Baltimore Federal's financial condition worsened and by 1987 its losses began to mount as large commercial real estate loans fell into default. By February 8, 1988, the number of nonperforming loans had increased to so damage Baltimore Federal's financial condition that it was compelled to enter into a consent agreement with the FHLBB. The agreement set strict limits on the institution's commercial real estate and construction lending and upon executive compensation. Also in February 1988, CEO and Board Chairman Hecht was forced to resign.

On February 7, 1989, the FHLBB determined that Baltimore Federal was insolvent and appointed the Federal Savings and Loan Insurance Corporation (FSLIC) conservator of Baltimore Federal. On August 9, 1989, RTC succeeded the FSLIC as conservator. On April 19, 1990, RTC was appointed receiver of the institution. And on February 6, 1992, one day short of three years after the appointment of the FSLIC as conservator, RTC brought this action against the defendant directors and officers.

In its complaint RTC focuses its claims on six specific commercial real estate loans,[5] all of which took place between

---

these complex, higher-risk ventures. By 1985, the institution had committed substantial funds to such loans. Many of these loans were for projects or properties in geographic areas far from the institution's lending area, such as Florida and Texas.

**5.** The loans at issue are as follows:

1. On November 11, 1983, Baltimore Federal purchased from First United Mortgage Company of Houston, Tex., 16 loans for $3,108,000, secured by 16 condominium units in the Lamar Towers complex in Houston.

November 11, 1983, and July 31, 1985, more than six and a half years before RTC filed this suit.

In the federal district court, all defendants raised limitations defenses by motion to dismiss or for summary judgment or by answer. They argued that RTC's claims were barred by Maryland's three-year statute of limitations, Maryland Code (1989, 1992 Cum.Supp.) § 5–101 of the Courts Article.[6] Judge

---

2. On March 8, 1984, Baltimore Federal purchased a $5,000,000 participation in a $36,000,000 acquisition, development and construction loan for a hotel and conference center known as Del Lago, in Montgomery County, Tex. On May 14, 1985, Baltimore Federal purchased a $1.9 million participation in a second mortgage of $12 million.

3. On December 5, 1984, Baltimore Federal purchased a $10 million participation in a $125 million revolving acquisition and development loan for a multi-use planned community, Mountain Creek, in Dallas, Tex.

4. On June 18, 1985, Baltimore Federal made a $1.8 million loan to River Creek Landing, Ltd., to finance the acquisition of 16 acres of unimproved land in Jacksonville, Fla.

5. On July 25, 1985, Baltimore Federal made a $700,000 loan to Cambridge Creek Development Corporation for the acquisition of land in Cambridge, Md.

6. On July 31, 1985, Baltimore Federal, through its wholly owned subsidiary, General Services Corporation, made an $8 million loan to Sybar Plaza–84 Joint Venture, for the acquisition and development of land in Davie, Fla.

**6.** Federal law provides that when a federal entity, such as RTC, attempts to assert a claim which it received by assignment, the court must conduct a two-step analysis. *Federal Deposit Ins. Corp. v. Howse*, 736 F.Supp. 1437, 1440 (S.D.Tex.1990); *Federal Deposit Ins. Corp. v. Hudson*, 673 F.Supp. 1039, 1041 (D.Kan.1987). First, the court must determine whether the applicable state limitations period had expired before the assignment. If it has expired, there is no claim to be assigned and suit is barred as a matter of law. If a viable claim exists at the time of assignment, the court must determine whether the applicable federal statute of limitations has expired. *Howse, supra*, 736 F.Supp. at 1440. The adverse domination issue involves the first prong of this analysis. The parties agree that if RTC's claims were viable on February 7, 1989, when the conservator was first appointed, then the subject lawsuit is also viable. When a federal entity becomes conservator of a financial institution, acquiring the assets of that institution, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 103 Stat. 183, provides that the entity will have three additional years from the date of conservatorship or accrual, whichever is later, in which to file suit on a tort claim, and six

Norman Ramsay denied the motions and held that this Court would adopt the adverse domination doctrine so as to toll the running of limitations so long as a majority of the corporate board consisted of persons liable for the subject cause of action. Following Judge Ramsay's retirement, the defendants moved to have Judge Marvin Garbis reconsider the ruling on adverse domination. Judge Garbis denied the motions, but disagreed with Judge Ramsay as to how this Court would rule on the adverse domination doctrine. Judge Garbis predicted that we would view the adverse domination doctrine as a corollary of the discovery rule. Under this view of the doctrine, limitations would be tolled only if, and until, a person reasonably able to cause the corporation to commence a law suit had knowledge sufficient under discovery rule jurisprudence to trigger the running of limitations.

Thus, the District Court has certified for our consideration the following questions, 833 F.Supp. 529:

1. Does Maryland law recognize the doctrine of adverse domination in any form or to any extent to toll the running of the Maryland Statute of Limitations or delay accrual of the causes of action alleged in the complaint filed in this case against former corporate officers and directors?

2. If the answer to Question 1 is in the affirmative, in what form and to what extent is the doctrine applicable in the context of the claims alleged in the complaint in this case?

II

A

Maryland law provides that directors of a corporation exercise all powers of the corporation,[7] unless conferred

---

additional years in which to file suit on a contract claim. 12 U.S.C. § 1821(d)(14).

7. Baltimore Federal was a mutual association, with members rather than shareholders. A mutual association is a non-stock corporation. *See* Md.Code (1980, 1992 Repl.Vol.) §§ 9–101(j) and 9–301(a)(1) of the

on or reserved to stockholders. Maryland Code (1975, 1993 Repl.Vol.) § 2–401 of the Corporations and Associations Article. In so doing, the board of directors acts as a unit. A director may not act alone for the corporation without authority from the board; rather, a director acts only as a member of the board whose identity is merged into the board. *Jackson v. Trust Co.,* 176 Md. 505, 509, 6 A.2d 380 (1939). The same holds true for officers of a corporation; they cannot bring suit without approval of a majority of the board. *Waller v. Waller,* 187 Md. 185, 189, 49 A.2d 449 (1946). As a general rule, shareholders are also barred from bringing actions on behalf of the corporation. *Davis v. Gemmell,* 70 Md. 356, 376, 17 A. 259 (1889).

### B

Section 5–101 of the Courts Article provides that "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." This rule is not absolute; other sections of the Courts Article provide different limitations periods for particular actions. *See, e.g.,* § 5–102 (12–year limitation for actions on specialties), § 5–103 (20–year limitation for adverse possession), § 5–105 (one-year limitation on actions for assault, libel or slander). The Maryland legislature has also created several exceptions which toll limitations in certain situations. *See, e.g.,* § 5–201 (persons under a disability), § 5–205 (absence from state or moving from county).

■ Statutes of limitation reflect legislative judgment of what is an adequate time for a person of ordinary diligence to bring an action. *Pennwalt Corp. v. Nasios,* 314 Md. 433, 437, 550 A.2d 1155 (1988); *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 665, 464 A.2d 1020 (1983); *Walko Corp. v. Burger Chef,* 281 Md. 207, 215, 378 A.2d 1100 (1977). One of their

---

Financial Institutions Article. Maryland corporation law applies to nonstock corporations. *See* Md.Code (1975, 1993 Repl.Vol.) § 5–201 of the Corporations and Associations Article.

purposes is to ensure fairness to defendants by encouraging promptness in bringing claims, thus avoiding problems that may stem from delay, such as loss of evidence, fading of memory, and disappearance of witnesses. *Pennwalt, supra,* 314 Md. at 437, 550 A.2d 1155; *Pierce, supra,* 296 Md. at 665, 464 A.2d 1020. Statutes of limitation are statutes of repose, allowing individuals the ability to plan for the future without the indefinite threat of potential liability. They serve society by promoting judicial economy. *Pierce, supra,* 296 Md. at 665, 464 A.2d 1020. But their purpose also is to serve plaintiffs, by providing adequate time for a diligent plaintiff to bring an action. *Pennwalt, supra,* 314 Md. at 437, 550 A.2d 1155.

■ We have long maintained a rule of strict construction concerning the tolling of the statute of limitations. Absent legislative creation of an exception to the statute of limitations, we will not allow any "implied and equitable exception to be engrafted upon it." *Booth Glass Co. v. Huntingfield Corp.,* 304 Md. 615, 623, 500 A.2d 641 (1985); *Walko, supra,* 281 Md. at 211, 378 A.2d 1100; *McMahan v. Dorchester Fert. Co.,* 184 Md. 155, 160, 40 A.2d 313 (1944).

Under § 5–101 the statute of limitations begins to run from the time the action "accrues." Because the term "accrue" is undefined by the legislature,[8] the question of accrual is left to judicial determination. *Poffenberger v. Risser,* 290 Md. 631, 633, 431 A.2d 677 (1981); *Goldstein v. Potomac Elec. Power Co.,* 285 Md. 673, 684, 404 A.2d 1064 (1979); *Harig v. Johns–Manville Products,* 284 Md. 70, 75, 394 A.2d 299 (1978). Therefore, when limitations are at issue, it is necessary to judicially determine when accrual occurred to trigger the

---

**8.** Sections 5–108 (actions arising out of injury to person or property occurring after improvement to realty) and 5–203 (ignorance of cause of action induced by fraud) are exceptions. In § 5–108, the legislature defined accrual relative only to that section, providing in subsection (e) that a cause of action accrues when the injury or damage occurs. In § 5–203, the legislature provided that when ignorance of a cause of action is induced by fraud, the action shall be deemed to accrue when the plaintiff discovered, or should have discovered, the fraud.

operation of the statute. This determination may be based solely on law, solely on fact, or on a combination of law and fact. *Poffenberger, supra,* 290 Md. at 634, 431 A.2d 677.

Historically, the general rule in Maryland was that a cause of action accrued on the date the wrong was committed. *Waldman v. Rohrbaugh,* 241 Md. 137, 139, 215 A.2d 825 (1966); *Hahn v. Claybrook,* 130 Md. 179, 182, 100 A. 83 (1917). Whether the plaintiff knew or should have known of the wrong was not considered in determining accrual. This "date of the wrong" rule did not differentiate between the plaintiff who was "blamelessly ignorant" of his potential claim and the plaintiff who had "slumbered on his rights," *Harig, supra,* 284 Md. at 83, 394 A.2d 299. It wrought harsh consequences in cases where plaintiffs' claims were barred, not only before they were able to perceive any harm, but before it was possible for them to learn that the negligence had taken place, such as in situations involving professional services where the plaintiff was not qualified to ascertain the injury. *Waldman, supra,* 241 Md. at 140, 215 A.2d 825, quoting *Developments in The Law, Statute of Limitations,* 63 Harv.L.Rev. 1177, 1201 (1950).

Recognizing the unfairness inherent in charging a plaintiff with slumbering on rights not reasonably possible to ascertain, this Court adopted what is known as the discovery rule, which now applies generally in all civil actions, and which provides that a cause of action accrues when a plaintiff in fact knows or reasonably should know of the wrong. *Poffenberger, supra,* 290 Md. at 636, 431 A.2d 677.

We first recognized the discovery rule in *Hahn, supra,* 130 Md. at 186–87, 100 A. 83. We applied the rule in the context of a medical malpractice claim, finding that the plaintiff's claim was barred because she had, in fact, discovered her injury more than three years before filing suit. *Id.* We thereafter applied the rule in an action for negligent design and construction of a wall, finding that the plaintiff's cause of action accrued 10 years after the negligent construction, because it was not until then that discovery of the claimed defects

occurred. *Callahan v. Clemens,* 184 Md. 520, 527, 41 A.2d 473 (1945). Later, in *Waldman, supra,* 241 Md. at 144–45, 215 A.2d 825, we expressly adopted the discovery rule in all medical malpractice claims. Subsequently, we extended application of the rule to all cases of professional malpractice. See, e.g., *Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972) (accountant); *Steelworkers Holding v. Menefee,* 255 Md. 440, 258 A.2d 177 (1969) (architect); *Mattingly v. Hopkins,* 254 Md. 88, 253 A.2d 904 (1969) (civil engineer); *Mumford v. Staton, Whaley & Price,* 254 Md. 697, 255 A.2d 359 (1969) (attorney).

We extended the rule's application to claims involving latent disease in *Harig, supra,* 284 Md. at 83, 394 A.2d 299. There we identified the critical factor in all applicable cases to be the "inherently unknowable" character of the injury. We said:

> "Like the victim of undiscoverable malpractice a person incurring disease years after exposure cannot have known of the existence of the tort until some injury manifests itself. In neither case can the tort victim be charged with slumbering on his rights, for there was no notice of the existence of a cause of action."

*Id.* at 80, 394 A.2d 299. We concluded that avoiding possible injustice in these situations outweighed interests in repose and administrative expediency. *Id.* Three years later, in *Poffenberger, supra,* 290 Md. at 636, 431 A.2d 677, a case involving negligence by a builder, we generally extended the sweep of the discovery rule to be applicable in all civil actions.

We further developed the discovery rule in *Pierce* and *Pennwalt, supra.* In *Pierce,* we held that when a plaintiff's exposure to asbestos resulted initially in the manifestation of asbestosis, and resulted subsequently in the manifestation of lung cancer, a separate, distinct latent disease, and the plaintiff had not sought tort recovery for the injuries resulting from asbestosis, a cause of action for the harm resulting from lung cancer accrued when lung cancer was or reasonably

should have been discovered. 296 Md. at 668, 464 A.2d 1020.[9] In *Pennwalt*, we applied the discovery rule in a product liability action, holding that the statute of limitations does not begin to run until the plaintiff knows or should know of the injury, its probable cause, and either manufacturer wrongdoing or product defect. 314 Md. at 452, 550 A.2d 1155.

The discovery rule requires that the plaintiff must have notice of a claim to start the running of limitations. We defined such notice in *Poffenberger* as "express cognition or awareness implied from 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.'" 290 Md. at 637, 431 A.2d 677, quoting *Baynard v. Norris*, 5 Gill. 468, 483, 46 Am.Dec. 647; *Higgins v. Lodge*, 68 Md. 229, 235, 11 A. 846, 6 Am.St.Rep. 437. In *Poffenberger*, the defendant, a builder, conceded that the plaintiff did not have express knowledge of the defendant's negligence, which resulted in plaintiff's home being built in violation of set-back requirements, until some four years after the construction, when a neighboring lot was surveyed and plaintiff was informed that his home was too close to the dividing line between the two lots. 290 Md. at 633, 431 A.2d 677. However, the defendant argued that the plaintiff had constructive knowledge of the negligence at the time the house was built, because the plats and deeds were recorded. We

---

**9.** We distinguished this holding from the "maturation of harm rule," which we have declined to adopt, *see, e.g., Harig v. Johns–Manville Products*, 284 Md. 70, 74 n. 1, 394 A.2d 299 (1978); *Leonhart v. Atkinson*, 265 Md. 219, 224, 289 A.2d 1 (1972), noting that the cause of action resulting from the lung cancer accrued at the time of the lung cancer's manifestation, not its maturation.

We reiterated our *Pierce* holding in *Smith v. Bethlehem Steel Corp.*, 303 Md. 213, 492 A.2d 1286 (1985), in which the plaintiff, who also worked near asbestos, developed asbestosis and then cancer, and brought suit within three years of being diagnosed with cancer. We found that if the plaintiff could prove that colon cancer was a latent disease separate and distinct from asbestosis, his action for damages from cancer did not accrue until the cancer was diagnosed. *Id.* at 234, 492 A.2d 1286.

explicitly rejected this argument, holding that this type of knowledge did not constitute the requisite knowledge within the meaning of the rule. *Id.* at 637, 431 A.2d 677. We made it clear that merely constructive notice—which rests not on facts but on strictly legal presumptions—was insufficient, maintaining that it would "recreate the very inequity the discovery rule was designed to eradicate." 290 Md. at 637, 431 A.2d 677.

In addition to the discovery rule, Maryland has recognized related common law theories which depart from the strict "date of the wrong" rule of accrual. The "continuation of events" theory was first recognized by this Court in *W., B. & A. Elec. R.R. Co. v. Moss,* 130 Md. 198, 100 A. 86 (1917), involving compensation for services extended over a period of time. We said that "in cases where there is an undertaking which requires a continuation of services, or the party's right depends upon the happening of an event in the future, the statute begins to run only from the time the services can be completed or from the time the event happens." *Id.* at 204–05, 100 A. 86. *Vincent v. Palmer,* 179 Md. 365, 19 A.2d 183 (1941), involved an employee who sued his employer on an agreement to share profits. We said that "[w]here a contract does not mention the period of employment, and the claim of the employee is based upon 'continuous employment,' indicating one entire contract, even though the work may be interrupted from time to time, the statute will not run until the completion of the contract." *Id.* at 374, 19 A.2d 183. *Waldman, supra,* involved a continuous course of treatment by a physician. We there noted that "if the facts show continuing medical or surgical treatment for a particular illness or condition in the course of which there is malpractice producing or aggravating harm, the cause of action of the patient accrues at the end of the treatment for that particular illness, injury or condition, unless the patient sooner knew or reasonably should have known of the injury or harm...." 241 Md. at 142, 215 A.2d 825. This continuous course of treatment rule is applied because of the confidential relationship between the physician and the patient. Because of this relationship of trust and

reliance, the patient is excused from making inquiry questioning the physician's care.[10]  *Booth, supra,* 304 Md. at 620, 500 A.2d 641; *Hill v. Fitzgerald,* 304 Md. 689, 698, 501 A.2d 27 (1985).

In adopting these common law rules to determine the question of accrual, we recognized that such a determination is "properly made with reference to the rationale underlying statutes of limitations." *Goldstein, supra,* 285 Md. at 684, 404 A.2d 1064; *Harig, supra,* 284 Md. at 75, 394 A.2d 299.  As we have stated, the purposes of statutes of limitation are to provide adequate time for a diligent plaintiff to bring suit as well as to ensure fairness to defendants by encouraging prompt filing of claims.  We said in *Pierce, supra,* "statutes of limitation are designed to balance the competing interests of each of the potential parties as well as the societal interests involved."  296 Md. at 665, 464 A.2d 1020.  Therefore, in determining the application of the statute to particular actions, we do so with awareness of the policy considerations unique to each situation.

### III

We turn now to the doctrine of adverse domination, which has not heretofore been considered by this Court, but which has been widely applied by federal courts in cases involving corporate causes of action against directors and officers.  *See, e.g., Farmers & Merchants Nat. Bank v. Bryan,* 902 F.2d 1520 (10th Cir.1990); *IIT, an Intern. Inv. Trust v. Cornfeld,* 619 F.2d 909 (2d Cir.1980); *International Railways of Central America v. United Fruit Co.,* 373 F.2d 408 (2d Cir.), *cert. denied,* 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967); *Resolution Trust Corp. v. Kerr,* 804 F.Supp. 1091 (W.D.Ark.1992); *Resolution Trust Corp. v. Gallagher,* 800

---

**10.** This common law rule was abrogated by the Maryland legislature when it enacted § 5–109 of the Courts Article.  Effective July 1, 1975, § 5–109 provides an absolute five-year limitation on the filing of medical malpractice claims, based upon the date injury was committed, notwithstanding any period of continuing treatment.  *Hill v. Fitzgerald,* 304 Md. 689, 501 A.2d 27 (1985).

F.Supp. 595 (N.D.Ill.1992); *Resolution Trust Corp. v. Gardner*, 798 F.Supp. 790 (D.D.C.1992); *Federal Deposit Ins. Corp. v. Howse*, 736 F.Supp. 1437 (S.D.Tex.1990); *Federal Deposit Ins. Corp. v. Greenwood*, 739 F.Supp. 450 (C.D.Ill.1989); *Federal Deposit Ins. Corp. v. Carlson*, 698 F.Supp. 178 (D.Minn. 1988); *Federal Sav. and Loan Ins. Corp. v. Burdette*, 696 F.Supp. 1196 (E.D.Tenn.1988); *Federal Deposit Ins. Corp. v. Hudson*, 673 F.Supp. 1039 (D.Kan.1987); *Federal Sav. and Loan Ins. Corp. v. Williams*, 599 F.Supp. 1184 (D.Md.1984); *Federal Deposit Ins. Corp. v. Bird*, 516 F.Supp. 647 (D.P.R. 1981); *Saylor v. Lindsley*, 302 F.Supp. 1174 (S.D.N.Y.1969). The doctrine is applied either to delay the accrual of a cause of action, *see, e.g., Hudson*, 673 F.Supp. at 1043, or to toll limitations, *see, e.g., Resolution Trust Corp. v. Gallagher*, 800 F.Supp. at 600, in situations involving claims by a corporation against its directors for injuries to the corporation.[11] Several versions of the doctrine exist, but the one which appears to be the most common, and which has the greatest effect on accrual or tolling, is the "disinterested majority" version, which provides that claims by a corporation do not accrue and/or limitations do not run against any of the culpable officers and directors until there exists a disinterested majority of nonculpable directors. *See Gallagher, supra; Federal Deposit Ins.*

---

**11.** Although we recognize, and will address, this distinction for purposes of the arguments herein, it has not been recognized by the majority of courts discussing the doctrine of adverse domination. Where adverse domination has been labeled an accrual doctrine and where it has been termed a tolling doctrine the application has been the same: to prevent limitations from running so long as a corporation is controlled by individuals against whom the corporation would have a cause of action. A number of federal courts have used the terms interchangeably, *see, e.g., Federal Deposit Ins. Corp. v. Manatt*, 723 F.Supp. 99, 105 (E.D.Ark.1989) ("The Court finds that under the 'adverse domination' method for determining when a cause of action accrues, the statute of limitations is tolled as long as the bank is dominated by the same wrongdoers against whom a cause of action exists."); *Federal Sav. and Loan Ins. Corp. v. Williams*, 599 F.Supp. 1184, 1195 (1984) ("This Court is persuaded that the better rule of law provides for the tolling of the statute of limitations and the postponement of the accrual of a cause of action until after the culpable defendants have relinquished control of the institution...." (citation omitted)).

*Corp. v. Howse,* 736 F.Supp. 1437, 1441 (S.D.Tex.1990); *Federal Deposit Ins. Corp. v. Greenwood,* 739 F.Supp. 450, 453 (C.D.Ill.1989); *Federal Sav. and Loan Ins. Corp. v. Williams,* 599 F.Supp. 1184, 1195 (D.Md.1984); *Federal Deposit Ins. Corp. v. Bird,* 516 F.Supp. 647, 651 (D.P.R.1981). This version operates under a presumption that "control of the association by culpable directors and officers precludes the possibility of filing suit because these individuals can hardly be expected to sue themselves or to 'initiate any action contrary to their own interests.'" *Bird, supra,* 516 F.Supp. 647, 652, quoting *First State Bank of Hudson County v. United States,* 599 F.2d 558, 563–64 (3d. Cir.1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642. Limitations do not begin to run against an officer who resigns if the other culpable directors remain in control of the corporation after the resignation. *Williams, supra,* 599 F.Supp. at 1193. This is because the directors are unlikely to initiate actions which may reveal their own wrongdoing. *Resolution Trust Corp. v. Gardner,* 798 F.Supp. 790, 795 (D.D.C.1992). As these cases hold, it is only when the culpable directors are replaced by a majority of nonculpable directors and are no longer in control that the claim can be brought. Control is presumed where such directors constitute a majority of the board, *Williams, supra,* 599 F.Supp. at 1195, and with control comes the power to conceal incriminating information, *Id.* at 1193, n. 12. Some courts seem to base their reasoning on the implicit understanding that with control comes non-disclosure and without knowledge of directors' wrongful activities plaintiffs have no meaningful opportunity to bring suit. *See, e.g., Bird, supra,* 516 F.Supp. at 651. Others use the rationale that the culpable directors cannot reasonably be expected to bring suit against themselves and that only when a new entity gains control of the institution can a claim be brought as a practical matter. *See, e.g., Howse,* 736 F.Supp. at 1441.

Some courts have stopped short of adopting the "disinterested majority" version of the doctrine and instead have held that limitations would not run only so long as there was no one with knowledge of facts giving rise to possible liability who

could or would have induced the corporation to bring an action. *See Bryan, supra,* 902 F.2d at 1522–23; *IIT, an Intern. Inv. Trust v. Cornfeld,* 619 F.2d 909, 931 (2d Cir.1980); *International Railways of Cent. Am. v. United Fruit Co.,* 373 F.2d 408, 414 (2d Cir.1967), *cert. denied,* 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975; *Resolution Trust Corp. v. Fleischer,* 826 F.Supp. 1273, 1276 (D.Kan.1993); *Saylor v. Lindsley,* 302 F.Supp. 1174, 1184 (S.D.N.Y.1969). Under this "single disinterested director" version the plaintiff has the burden of showing "full, complete and exclusive" control by the culpable directors charged with wrongdoing and must negate the possibility that an informed director or shareholder could have induced the corporation to institute suit. *Bryan, supra,* 902 F.2d at 1522; *Fleischer, supra,* 826 F.Supp. at 1278.

A third version provides that a cause of action will accrue against a particular director when that director leaves the board and no longer participates in the control of the corporation. *See, e.g., Federal Deposit Ins. Corp. v. Carlson,* 698 F.Supp. 178, 180 (D.Minn.1988); *Hudson, supra,* 673 F.Supp. at 1042 [12].

The defendants set forth a fourth related theory, which provides that limitations are not tolled in situations where the culpable directors appear to control but where in actuality governmental regulators have the power to control the corporation, thus rendering the board's control "illusory." We are unaware of any court which has adopted this "illusory control" version of the doctrine. It was rejected in *Resolution Trust Corp. v. Kerr,* 804 F.Supp. 1091 (W.D.Ark.1992), where defendants argued that they no longer controlled the corporation after it entered into a consent agreement with the FHLBB. In rejecting defendants' argument, the court held that they were unable to establish as a matter of law that the directors' control or domination ended when the consent agreement was

---

**12.** The court in *Hudson* stated that it need not decide whether limitations were tolled until the rest of the culpable directors lost control of the corporation because even if the cause of action accrued at the earlier date—the date the particular defendant left the board—the action was not time-barred. 673 F.Supp. at 1043.

signed. 804 F.Supp. at 1095. *See also Fleischer, supra*, 826 F.Supp. at 1277–78 (the failure to act by a regulatory agency, which may have received some limited and incomplete information as to the potential wrongdoing, is not in itself a bar to equitable tolling where the directors who have participated in the wrongdoing fail to fulfill their fiduciary duties to the corporation); *Howse*, 736 F.Supp. at 1442 (entry of consent agreement and appointment of supervisory agent did not end domination by defendant directors).

Some state courts have applied the concept of adverse domination without so labeling it.[13] *See, e.g., Greenleaf v. Profile Cotton Mills*, 235 Ala. 530, 180 So. 582 (1938) (limitations tolled so long as the defendant remained in control of corporation because the corporation's only means of acquiring knowledge of wrongdoing was through the defendant); *San Leandro Canning Co. v. Perillo*, 211 Cal. 482, 295 P. 1026 (1931) (limitations did not begin to run against directors' unauthorized payment of commission for sale of stock while they were in full control of corporation); *Bates Street Shirt Co. v. Waite*, 130 Me. 352, 156 A. 293 (1931) (statute does not begin to run where defendant directors are in control of corporation and charged with duty of instituting action against themselves); *Ventress v. Wallace*, 111 Miss. 357, 71 So. 636 (1916) (limitations did not run against directors charged with gross negligence during period in which they had exclusive possession and control and either willfully or negligently concealed knowledge of corporation's losses); *Bilby v. Morton*, 119 Okl. 15, 247 P. 384 (1926) (corporation could not discover

---

**13.** Some state courts have rejected the concept. *See, e.g., INB Nat. Bank v. Moran Elec. Service*, 608 N.E.2d 702 (Ind.App.Ct.1993) (stating that the "presidential domination" theory of tolling a statute of limitation has not been recognized in Indiana); *Mobley v. Russell*, 174 Ga. 843, 164 S.E. 190 (1932) (statute not tolled in action against directors making excessive loans when directors remained continuously in control until failure of the bank); *Department of Banking v. McMullen*, 134 Neb. 338, 278 N.W. 551 (1938) (statute of limitations not tolled because directors remained in control of bank where no inducement, fraud or concealment charged); *Squire v. Guardian Trust Co.*, 79 Ohio App. 371, 72 N.E.2d 137 (1947) (rejecting doctrine of continuing domination; lack of knowledge or concealment not sufficient to toll the statute).

and reveal fraud of its officers because it could speak only through them and was at all times under their control). *Allen v. Wilkerson*, 396 S.W.2d 493 (Tex.Civ.App.1965) (for limitations to run against corporation's right of action against director, there must be notice to disinterested majority of board of directors). *See also* Annotation, *Running of Statute of Limitations against action against bank directors or officers for making excessive or unauthorized loans.*, 83 A.L.R. 1204 (1933).

## IV

The defendant directors and officers argue that the doctrine of adverse domination is inconsistent with Maryland law. They assert that this Court has declined consistently to judicially adopt tolling mechanisms and that the Maryland legislature has provided for such exceptions where deemed appropriate. The defendants further argue that the doctrine of adverse domination is a flawed doctrine that is contrary to sound public policy and the optimum balance of competing interests already achieved by this Court. And finally, the defendants maintain that the doctrine accomplishes nothing more than what is accomplished through existing law. We will address each of these arguments.

## A

In support of their first argument, defendants rely on *Booth Glass Co. v. Huntingfield Corp.*, 304 Md. 615, 500 A.2d 641 (1985); *Walko Corp. v. Burger Chef*, 281 Md. 207, 378 A.2d 1100 (1977); and *McMahan v. Dorchester Fert. Co.*, 184 Md. 155, 40 A.2d 313 (1944) in which we declined to judicially adopt tolling exceptions to the statute of limitations.

*McMahan* involved an action to collect a debt on a promissory note to which the 12–year statute of limitations applied. The statute provided specifically that if the debtor made a payment of interest during the limitation period, the operation of the statute would be suspended for three years after that payment. The debtor made two payments toward the princi-

pal, not the interest. Because the legislature limited the tolling mechanism to payment of interest, not principal, we declined in *McMahan* to expand the effect of the statute.

*Walko* required us to determine whether the three-year statute of limitations was suspended during the period in which the plaintiff attempted, unsuccessfully, to intervene in another action. The plaintiff's motion to intervene lay pending for 60 days and was denied 11 days before the expiration of the three-year limitation period. Plaintiff then filed suit approximately one month after the expiration of the limitations period, alleging the same cause of action relied upon in the motion for intervention. We held that plaintiff's claim was time-barred, finding that plaintiff had provided no reason for the failure to file a separate but timely action, which could have been done without inconvenience, there being no material difference between the complaints filed in each action.

*Booth* involved an action against a contractor for negligence in installing glasswork in a building. We there held that the three-year statute of limitations was not tolled during the two-year period in which the contractor attempted to repair the defective installation. We rejected the application of the continuous course of treatment or continuation of events theories to these circumstances because neither had any application to accrual of the cause of action. There was no continuing contractual relationship between the parties to delay accrual. The suit was for the negligent installation, not for any subsequent negligent acts committed in the repair attempts. Upon application of the discovery rule, we found that plaintiff's claim accrued when he discovered or reasonably should have discovered the negligence, and that was when the original work was completed. Because he filed suit more than three years after the claim accrued, his suit was time-barred.

We cannot agree with the defendants' contention that these decisions reflect judicial precedent inconsistent with the application of adverse domination principles. They are distinguishable in two critical respects. In each of these three cases it was undisputed that the plaintiff had actual knowledge of his

cause of action *and* the unfettered ability to file suit at all times during the limitations period. These plaintiffs chose, for various reasons, not to file suit until after the limitations period expired. They were not prevented from discovering that they had a claim or from filing suit. No concealment or other barrier to suit was alleged. No issue of control over the plaintiff by the defendants was involved.

In contrast, adverse domination principles are based upon the recognition that where potential defendants are in control of the plaintiff corporation it is unrealistic to expect that those defendants will either facilitate discovery of a claim or assert a claim against themselves in favor of the corporation. Such actions are clearly adverse to their own interests, unlike the situations in the cited cases.

Moreover, these cases involved efforts to create tolling exceptions to the statute in situations where there was no issue of accrual and the application of the statute was clear. Because the legislature provided explicitly for certain tolling mechanisms to interrupt a claim after it had accrued, we properly left to legislative judgment the creation of any further exceptions to toll limitations. However, as we have stated, where the legislature has not provided guidance, it has been left to the Court to define the process for determining accrual.

We believe that the principles of adverse domination are more logically applied to determine accrual of a claim. The doctrine is premised upon the understanding that knowledge of a claim by defendant directors cannot reasonably be imputed to the corporation. This rule is consistent with Maryland agency law, which provides that knowledge of an agent whose interests are adverse to the principal cannot be imputed to the principal. *Lohmuller Bldg. Co. v. Gamble,* 160 Md. 534, 541, 154 A. 41 (1931). A corporation can act only through its agents. *Maryland Trust Co. v. Mechanics Bank,* 102 Md. 608, 629, 63 A. 70 (1906). And notice to an officer or agent is notice to the corporation "where the officer or agent in the line of his duty 'ought, and could reasonably be expect-

ed, to act upon or communicate the knowledge to the corporation.'" *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 580 (Tex.1963), quoting 3 Fletcher Cyc. Corp. § 793 (Perm.Ed.1986). In an adverse domination situation the agent cannot reasonably be expected to act upon or communicate knowledge of his own wrongdoing to the corporation. Therefore, in most cases, corporate board members and officers control the corporation and constitute an insuperable barrier to a corporation's ability to acquire the knowledge and resources necessary to bring suit against the directors and officers. As we said in *Harig, supra,* it is the "inherently unknowable" character of the injury that is the critical factor that governs the applicability of the discovery rule. 284 Md. at 80, 394 A.2d 299. The discovery rule provides that accrual takes place only when a plaintiff has notice of the existence of a cause of action. The doctrine of adverse domination presumes that actual notice will not be available until the corporate plaintiff is no longer under the control of the erring directors.

The defendants argue that, unlike the discovery rule, the doctrine of adverse domination is based not upon knowledge, but upon the power to act upon that knowledge. Therefore, they conclude, it cannot be considered as a corollary to the discovery rule. We believe this distinction ignores the practical realities of the situation in which the doctrine arises. Because, in most cases, defendants' control of the corporation will make it impossible for the corporate plaintiff independently to acquire the knowledge and resources necessary to bring suit, actual notice of a claim will not be possible until the corporate plaintiff is no longer under the control of the defendant board members.

The defendants argue that if the adverse domination doctrine is considered an accrual doctrine, no one could ever bring suit on behalf of a corporation until the culpable directors resign because the claim would not accrue until that time. Thus, they claim, the doctrine would have the effect of making it *more* difficult for a corporation to sue a director who has harmed the corporation. We disagree with this interpretation.

The doctrine of adverse domination does not mandate that accrual will occur only after the wrongdoing directors have lost control of the corporation. Rather, it sets forth a presumption that differs according to which version of the doctrine is applied.

The "disinterested majority" version carries the presumption that "control of the association by culpable directors and officers precludes the possibility of filing suit because these individuals can hardly be expected to sue themselves or to 'initiate any action contrary to their own interests.'" *Bird, supra,* 516 F.Supp. at 652, quoting *First State Bank of Hudson County v. United States,* 599 F.2d 558, 563–64 (3d. Cir. 1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642. This presumption can be rebutted, however, by evidence that someone other than the wrongdoing directors had knowledge of the cause of action, and both the ability and the motivation to bring suit. This burden of production is on the defendant, who has the obligation to prove the defense of limitations. Generally, the party raising the statute of limitations defense has the burden of proving a time of accrual that makes the filing of the action untimely or barred by limitations. *Newell v. Richards,* 323 Md. 717, 725, 594 A.2d 1152 (1991).

Under the "single disinterested director" version, the burden is upon the plaintiff, who must show "full, complete and exclusive" control by the directors charged with wrongdoing, and must negate the possibility that an informed director or shareholder could have induced the corporation to institute suit. *Bryan, supra,* 902 F.2d at 1522, *Fleischer, supra,* 826 F.Supp. at 1278. Once the corporate plaintiff has shown that such control existed, and that there was no one else with the knowledge and ability to sue, then accrual will not be deemed to have occurred until someone other than the culpable directors gained such knowledge and the ability to act on that knowledge.

The defendants argue that adverse domination principles are inconsistent with Maryland legislation because the legisla-

ture has by statute provided for delayed accrual in situations involving fraudulent concealment.[14]  They say that the enactment of the statute reflects a legislative determination that *only* fraudulent concealment by an officer or director will be sufficient to toll limitations.  In contrast, adverse domination principles provide for delayed accrual in cases in which fraud is not alleged.

There are situations other than those which involve fraud where a corporation can be blamelessly unaware of a potential claim against directors and officers.  Indeed, the directors and officers may be so disengaged from their responsibilities that they themselves are unaware of the breach of their duty to the corporation.  Under these conditions, there is hardly greater likelihood that the corporation will be able to discover the cause of action.

We conclude that the doctrine of adverse domination is not inconsistent with Maryland legislation or with the previous decisions of this Court.

## B

The defendants argue next that the doctrine of adverse domination is a flawed doctrine that is contrary to sound public policy and the optimum balance of competing interests already achieved by this Court.  They assert that the doctrine distorts general principles of corporate law by altering dramatically the potential liability of corporate directors and officers, and "virtually neutralizing" the statute of limitation with regard to these individuals.  Such an effect, they maintain, is diametrically opposite to existing Maryland law and to basic principles of fairness.  We disagree.

Not only is the doctrine consistent with Maryland law, but fairness requires its application in the context of corporate claims against directors and officers.

---

14.  Section 5–203 of the Courts Article provides that when ignorance of a cause of action is induced by fraud, the action shall be deemed to accrue when the plaintiff discovered, or should have discovered, the fraud.

As we stated earlier, the directors of a corporation exercise all powers of the corporation, unless lawfully delegated to corporate officers or reserved to stockholders. A director or officer may not act alone for the corporation without authority from the board. Thus, the balance of power is weighted heavily in favor of the majority of a board of directors. They have virtually sole power in determining whether to file suit on behalf of a corporation on the theory of a breach of duty owed to the corporation by one or more directors or principal officers. The defendants aver that in many instances conscientious directors would bring suit against themselves for gross negligence. And, they continue, the fraudulent concealment statute provides for those directors who would conceal evidence of wrongdoing from the corporation. Although there exists a possibility that a board of directors could decide to bring suit against itself, we consider the possibility to be minute at best. Moreover, we previously have indicated that where directors controlled a corporate association, the corporation could not effectively bring suit against them. Indeed, "the court would not permit [directors] to conduct litigation against themselves even if they were willing to do so." *Parish v. Milk Producers Assn.*, 250 Md. 24, 84, 242 A.2d 512 (1968), *aff'd on reh'g*, 261 Md. 618, 277 A.2d 19, *cert. denied*, 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971).

The defendants also point out that the doctrine potentially could cause accrual to be suspended for many years, in situations where a corporate board membership remains unchanged. They set forth the following example. Ten individuals form a corporation in 1963. During the first year of the corporation, six of the ten vote in favor of a measure that results in harm to the corporation. All members of management and all shareholders know of the facts giving rise to the claim at the time they occur. A year later, one of the directors who voted in favor of the measure leaves the board and is replaced. The remaining nine members of the original board remain on the board until 1993, when the corporation is sold to new owners. Under these circumstances, defendants maintain, the new owners would be able to sue the former

board members based on the claim that arose thirty years before. The suit would be timely, they say, because at no time until the sale of the corporation did the disinterested directors constitute a majority of the board. Limitations would have been tolled the entire time. Thus, they conclude, the officers and directors of corporations would have no repose from potential claims.

We grant that the "disinterested majority" version of the doctrine carries a presumption that until disinterested directors constituted a majority of the board, the cause of action would not be deemed to have accrued. However, this presumption could be rebutted by the five remaining culpable directors if they could show in the above situation that the five disinterested directors could have brought suit against them on behalf of the corporation at any time before the sale of the corporation. Moreover, defendants' illustration ignores the operation of the contemporaneous ownership rule, which provides that a shareholder does not have standing to recover against directors for acts which took place prior to the shareholder becoming a shareholder. *See Ettridge v. TSI Group, Inc.*, 314 Md. 32, 41, 548 A.2d 813 (1988); *Eisler v. Eastern States Corp.*, 182 Md. 329, 335, 35 A.2d 118 (1943); *Matthews v. Headley Chocolate Co.*, 130 Md. 523, 534, 100 A. 645 (1917).

The defendants also point to a well-established exception to the rule that only directors can bring an action on behalf of a corporation. Where directors refuse to bring an action, shareholders may be able to institute proceedings. Generally they must first make a demand to the directors to act for the corporation. However, this demand is excused if it would be deemed to be futile. *Eisler v. Eastern States Corp.*, 182 Md. 329, 333, 35 A.2d 118 (1943). In a situation where the allegations in the complaint state causes of action for wrongdoing on the part of a majority of directors, such a demand would be considered futile, and thus would be excused. *Parish, supra*, 250 Md. at 83, 242 A.2d 512.

Again, however, where directors control all information and resources, it may be extremely difficult, if not impossible, for

shareholders to gain access to the information and resources necessary to bring suit. It is unlikely that members of a savings and loan association would be able to leap the hurdles necessary to bring an action in this situation. Thus, equitable considerations warrant a shifting of the balance in favor of the corporation or association.

## C

Finally, the defendants maintain that the doctrine accomplishes nothing more than what is accomplished through existing law. Again, we disagree.

The doctrine extends the discovery rule to situations in which a corporation is prevented from discovering a cause of action because there is no one who has the knowledge, ability and motivation to act for the corporation. It provides that the claim will not accrue until there is someone who can discover the claim and act for the corporation. It goes beyond the principles of agency law which provide that knowledge of an agent will not be imputed to the principal if the agent acts adversely to the principal. It provides a presumption that there is no knowledge and no accrual while wrongdoers control the corporation. This presumption must be rebutted by those in control. This prevents the culpable directors from benefiting from their lack of action on behalf of the corporation.

We disagree with the defendants that the fraudulent concealment statute accomplishes these purposes. It is not only in situations involving fraud that a corporation can be prevented from learning of a potential claim against its directors and officers. It is unlikely that directors will take the affirmative step of communicating information that could raise criticism of their performance. It is the fact of their control over information, not necessarily any fraudulent activity, that makes the doctrine necessary:

"The rationale is that if the wrongdoers by virtue of their control of corporate decisionmaking have foreclosed the possibility that the corporation might bring suit, then they

should not reap benefit from their position of domination and during such time the corporation should not be held to account for the delay in instituting suit." *Saylor v. Lindsley*, 302 F.Supp. 1174, 1184 (S.D.N.Y.1969).

Thus, we answer the first certified question in the affirmative. Moreover, we would apply the "disinterested majority" version of the adverse domination doctrine to govern accrual of claims by corporations against directors and officers for harm to the corporation when the culpable directors constituted a majority of the board of directors. To rebut a presumption that accrual of the claim does not take place until a disinterested majority has replaced the culpable directors in control of the corporation, the defendants have the burden of showing that there was someone who had the knowledge, ability and motivation to bring suit during the period in which defendants controlled the corporation.

It is appropriate that the defendants bear this burden because they have greater access to relevant information, and it is more probable that no one else was in the position to bring suit. Principles governing the allocation of burdens of proof and production include whether facts lie within the knowledge of a party and whether probabilities are such that one proposition is more likely. The burden is placed on the party who contends that the more unusual event has occurred. Another factor to consider is fairness. *See McCormick on Evidence*, § 337 at 429–32 (4th Ed.1992), *9 Wigmore on Evidence*, § 2486 at 290–91 (Chadbourne rev. 1981). Placing this burden upon the defendants who control the corporation's information shifts the balance more fairly between the defendants and the corporation. The doctrine carries the same requirement of notice before accrual is deemed to have occurred. As with the discovery rule, the test is whether the plaintiff knows or should know of the claim.

## V

█ Turning now to the facts of this case, we are asked by the United States District Court for the District of Maryland

in our second certified question to determine in what form and to what extent the doctrine is applicable in the context of the claims alleged in this case.

Maryland law would apply the "disinterested majority" version of the doctrine to the facts in this case because during all relevant times the culpable directors constituted a majority of the board. In order to rebut the doctrine's presumption that the claim did not accrue until after the directors lost control of the institution, defendants must show that someone else could have acted for the association before the directors relinquished control.

CERTIFIED QUESTIONS ANSWERED AS HEREIN SET FORTH; COSTS DIVIDED EQUALLY BETWEEN THE PARTIES.

ROBERT M. BELL, Judge, dissenting.

I agree with the majority that the adverse domination theory is a corollary to the discovery rule and, therefore, properly is characterized as an accrual doctrine. On the other hand, I disagree that it is the "disinterested majority" variant of the theory that should be adopted as the law of Maryland. On the contrary, I believe that the "single disinterested director" version, as enunciated in *Farmers & Merchants Nat'l Bank v. Bryan*, 902 F.2d 1520 (10th Cir.1990), is more consistent with Maryland law and, thus, it is that variant that ought to be adopted. Under the "single disinterested director" theory of adverse domination, the burden is placed on the plaintiff to prove that there was, during the period of domination, no director who could, or would, have brought suit on behalf of the corporation.[1]

---

1. I question the application of the adverse domination doctrine when the issue whether there is a cause of action depends upon an evaluation of the exercise of judgment by the directors. There is a significant difference between defrauding the corporation and its shareholders and, in good faith, using bad judgment, even to the point of recklessness. The cases, however, recognize the applicability of adverse domination in the imprudent loan context. *Bryan*, 902 F.2d 1520; *FDIC v. Carlson*, 698 F.Supp. 178 (D.Minn.1988); *FSLIC v. Williams*, 599

Adverse domination has relevance only in the context of an attempt to avoid the preclusive effect of the statute of limitations on a cause of action. Only when the defendant raises the statute of limitations as a bar and establishes its application does the issue of corporate control, or domination, become an issue. That the corporation was controlled, or dominated, by the defendants during the period in which the actionable conduct occurred is a matter which affects whether the corporation should be held to account for the delay in instituting suit; it tolls the running of the statute of limitations. *RTC v. Kerr,* 804 F.Supp. 1091, 1094–95 (W.D.Ark.1992); *RTC v. Gallagher,* 800 F.Supp. 595 (N.D.Ill.1992); *FDIC v. Carlson,* 698 F.Supp. 178, 180 (D.Minn.1988). *See FSLIC v. Williams,* 599 F.Supp. 1184, 1194 (D.Md.1984). Its rationale is that the wrongdoers should not reap the benefit when the possibility of suit is foreclosed by virtue of their control of corporate decision making. *Moviecolor Limited v. Eastman Kodak Co.,* 288 F.2d 80, 83 (2d Cir.), *cert. denied,* 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961); *Saylor v. Lindsley,* 302 F.Supp. 1174, 1184 (S.D.N.Y.1969); *FDIC v. Howse,* 736 F.Supp. 1437, 1441–42 (S.D.Tex.1990). As the *Howse* court put it:

"As long as the majority of the board of directors are culpable they may continue to operate the association and control it in an effort to prevent action from being taken against them. While they retain control they can dominate the non-culpable directors and control the most likely sources of information and funding necessary to pursue the rights of the association. As a result, it may be extremely difficult, if not impossible, for the corporation to discover and pursue its rights while the wrongdoers retain control."

736 F.Supp. at 1442, quoting *Williams,* 599 F.Supp. at 1193–94 n. 12. Moreover, as stated in *Williams,* 599 F.Supp. at 1194, quoting *FDIC v. Bird,* 516 F.Supp. 647, 652 (D.P.R.1981), quoting *First State Bank of Hudson County v. United States,*

---

F.Supp. 1184 (D.Md.1984). Because I believe that the burden of proof issue is dispositive in this case, there is no need to address whether this fundamental question heretofore has been decided properly.

599 F.2d 558, 563–64 (3d Cir.1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642:

The rationale for this principle is that control of the association by culpable directors and officers precludes the possibility of filing suit because these individuals can hardly be expected to sue themselves or to "initiate any action contrary to their own interests."

*See also FDIC v. Hudson,* 673 F.Supp. 1039, 1042 (D.Kan. 1987); *cf. Carlson,* 698 F.Supp. at 180; *FSLIC v. Burdette,* 696 F.Supp. 1196, 1200 (E.D.Tenn.1988); *FDIC v. Buttram,* 590 F.Supp. 251, 254 (N.D.Ala.1984).

Like the discovery rule, under which a cause of action accrues at the time the plaintiff first knows, or reasonably should have known, of the alleged wrong, *Pennwalt Corp. v. Nasios,* 314 Md. 433, 441, 550 A.2d 1155, 1159 (1988); *Poffenberger v. Risser,* 290 Md. 631, 636, 431 A.2d 677, 680 (1981); *Harig v. Johns–Manville Products Corp.,* 284 Md. 70, 394 A.2d 299 (1978), adverse domination is an exception to the general rule that a cause of action accrues when the wrong is done. *Bird,* 516 F.Supp. at 651; *Williams,* 599 F.Supp. at 1194; *FDIC v. Hudson,* 673 F.Supp. 1039, 1041–42 (D.Kan. 1987).

In *Farmers & Merchants Nat'l Bank v. Bryan,* 902 F.2d 1520 (10th Cir.1990), the doctrine of adverse domination was applied in a case much like the one *sub judice,* where the former officers and directors were sued for violating federal lending limits and making imprudent loans. Characterizing the doctrine "as another equitable vehicle under federal common law for tolling the statute of limitations," the court, in effect, equated it with the application of the discovery rule in cases where there is active concealment. *See id.* at 1522. Explaining the relevant inquiry, the court said:

"[A] plaintiff who seeks to toll the statute on the basis of domination of a corporation has the burden of showing "a full, complete and exclusive control in the directors or officers charged." *Payne v. Ostrus,* 50 F.2d 1039, 1042, 77 A.L.R. 531 (8th Cir.1931). Such control was found for

example, in *Adams v. Clarke*, 22 F.2d 957 (9th Cir.1927), where all the directors were accused of wrongdoing and held a majority of the capital stock, and also in our [*Michelsen v. Penney*] case, *supra* [135 F.2d 409] (2d Cir.1943). This principle must mean at least that once the facts giving rise to a possible liability are known, the plaintiff must effectively negate the possibility that an informed director could have induced the corporation to sue."

*Id.* at 1522–23, quoting *International Railways of Central America v. United Fruit Company*, 373 F.2d 408, 414 (2d Cir.), *cert. denied*, 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967). The court added: "Of course, a plaintiff may also demonstrate adverse domination by proving that an informed director, though capable of suing, would not do so." *Id.* at 1523. Thus, the court placed the burden of proving that the corporation should be excepted from the rule that an improper loan accrues at the time the loan is made squarely on the shoulders of the plaintiff, the proponent of the action. *See United Fruit Co.*, 373 F.2d at 419; *see also ITT v. Cornfeld*, 619 F.2d 909, 931 (1980); *Michelsen v. Penney*, 135 F.2d 409, 415–16 (2d Cir.1943); *Moviecolor Limited*, 288 F.2d at 88–90. The majority, on the other hand, would place that burden on the defendant. As it sees it:

This presumption [engendered by the "disinterested majority" version of the adverse domination doctrine] can be rebutted ... by evidence that someone other than the wrongdoing directors had knowledge of the cause of action, and both the ability and the inclination to bring suit. This burden of production is on the defendant, who has the obligation to prove the defense of limitations.

Maj. op. at 347. The majority cites, for support, *Newell v. Richards*, 323 Md. 717, 725, 594 A.2d 1152, 1156 (1991).

In *Newell*, the question presented concerned the allocation of the burden of proof "when a defendant asserts that the three-year 'discovery' provision of § 5–109(a)(2) should bar a claim that is filed within the five-year provision of § 5–109(a)(1)." 323 Md. at 724–25, 594 A.2d at 1156. Although we

recognized the general rule that the party relying on the statute of limitations to avoid a cause of action carries the burden both to plead and prove the statute as an affirmative defense, *id.,* we also acknowledged, citing and discussing *Finch v. Hughes Aircraft Company,* 57 Md.App. 190, 469 A.2d 867, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336, *reh'g denied,* 471 U.S. 1049, 105 S.Ct. 2043, 85 L.Ed.2d 341 (1985), and *Comptroller v. World Book Childcraft Internat'l, Inc.,* 67 Md.App. 424, 508 A.2d 148 (1986), that, under certain circumstances, a plaintiff may have the burden of proof even though a limitations defense has been interposed. We explained why those cases were distinguishable and, so, provided the rationale for the principle which is applicable in the case *sub judice:*

> The issue in *World Book* [2] was whether or not a tax assessment could be maintained where the defendant could show that the claim was, on its face, barred by limitations. In that case, the rationale for placing the burden of proof on the plaintiff to show the statute of limitations had not run was that the plaintiff was trying to evoke an exception to the statute of limitations and should have the burden to prove the exception. *Finch* involved a plaintiff who alleged that fraudulent concealment had prevented filing an action for breach of contract within the statutory period. Probably the most typical situation where the courts apply the cited principle is in cases of fraudulent concealment, such as *Finch.* In these cases, the burden is on the plaintiff to

---

**2.** In *Comptroller v. World Book Childcraft Internat'l, Inc.,* 67 Md.App. 424, 444, 508 A.2d 148, 158 (1986) (citations omitted), the Court of Special Appeals opined:

> [A] party relying on a matter in avoidance of the statute of limitations defense bears the burden of proving such a matter where it is shown that the cause of action accrued earlier than permitted by applicable statute.
>
> In applying this rule to common law fraud or breach of contract actions, and in civil actions generally ... we have held that the "burden is on [the plaintiffs] to prove that they did not discover the alleged wrong" until after the limitations had expired.

show an expired limitations period should not bar a claim. Thus, the legal principle cited by Richards is usually applied where a plaintiff concedes that the statutory period has run but asserts that some equitable reason or exception exists which prevents the claim from being barred. This was the situation in both *Finch* and *World Book.*

*Newell,* 323 Md. at 725–26, 594 A.2d at 1156–57.

This is precisely the situation in this case. The plaintiff does not maintain that the elapsed time between the occurrence of the actionable conduct and the filing of suit does not exceed the period of limitations applicable to the cause of action brought; rather, the plaintiff argues that it would be inequitable to allow the preclusive effect of the statute of limitations to apply in this case. This is so, it says, because the corporation, which can act only through agents, was controlled by the very persons who are being sued for the wrongful conduct and it would be inequitable to allow those agents to benefit from that control. Having conceded that, but for the adverse domination, limitations would have run, but arguing that the adverse domination doctrine is an exception to the rule that a cause of action "accrues" immediately, as we recognized in *Newell,* the plaintiff should bear the burden of proving the exception.

That the plaintiff uses the term, "accrue," in discussing the exception is not dispositive of the resolution of this issue. Accrual, in the sense in which the plaintiff uses it, relates to the ability of the corporation to bring the action, not whether the acts constituting the cause of action were known, or should have been known, at some earlier time. The causes of action brought by the plaintiff accrued, in the usual sense, when the conduct, on the basis of which the actions were brought, was engaged in—when the imprudent loans were made. There is no allegation that there was fraud in this case or that the loan policy of the corporation, or any other action taken by the defendants in this case, was the subject of any active concealment efforts on the part of the defendants. Indeed, in this case, it is not at all clear that the entire board of directors voted in favor of each of the subject loans. It may be that the

knowledge of directors who voted against the transactions may be attributable to the corporation, thus giving the corporation knowledge of the cause of action. Under that scenario—a divided vote on the loans—notwithstanding that the corporation was controlled by directors who voted in favor of the loans, it would have been possible for suit to have been brought on behalf of the corporation. *Parish v. Maryland and Virginia Milk Producers Association,* 250 Md. 24, 81–82, 242 A.2d 512, 544 (1968), *cert. denied,* 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971) (single director or shareholder can bring action on behalf of corporation without making demand on the board of directors to do so when futile to make such demand).

I would assume, without deciding, that the doctrine of adverse domination would apply in this case and then answer the second question as follows: Maryland recognizes that variant of the adverse domination doctrine known as the "single disinterested director" as enunciated in *Bryan.*

CHASANOW, J., joins in the views herein expressed.